## MOUNTAIN MANOR REALTY, INC. ET AL. v. JEAN M. BUCCHERI ET AL.

[No. 1517, September Term, 1982.]

*Decided June 14, 1983.*

The cause was argued before LISS, WILNER and GARRITY, JJ.

*Kenneth C. Lundeen,* with whom were *Smith, Somerville & Case, Clater W. Smith, Jr.,* and *Shoemaker, Smith & Clapp* on the brief, for appellants.

*Samuel M. Grant,* with whom were *David J. Preller, Sr.,* and *Preller & Preller* on the brief, for appellees.

WILNER, J., delivered the opinion of the Court.

Employing tactics worthy of the princes of the Italian Renaissance, two factions battled for control of Mountain Manor, Inc., a Maryland corporation that operates an alcoholic rehabilitation facility in Emmitsburg. Through secret (and partly improper) stock purchases, appellees appeared to have victory within reach, only to find themselves outmaneuvered by appellants. Appellants' ploy, however, was, in proper legal language, declared "tacky" by the Circuit Court for Frederick County; and the effect of that was to restore appellees to their position of dominance. Aggrieved at their loss of corporate control, appellants have brought this appeal.

The underlying facts are not in dispute. We may summarize them as follows.

Mountain Manor, Inc. (MMI) was incorporated in 1974. The charter authorized 10,000 shares of $10 par common stock, but only 56 shares of that stock were initially issued. One of the original stockholders was Charles W. Roby, who acquired 12 shares. Minutes of a special meeting of directors held on August 19, 1974, reveal that an agreement was executed on behalf of the corporation and by the then-current stockholders which, among other things, precluded those stockholders from selling any of their stock without first offering it to the corporation. The corporation was given the option of matching any bona fide offer from a third party or paying book value, whichever was less.

In 1976, efforts of some sort were made to interest appellant, John V. Conway, in investing in MMI. In December of that year, a corporation owned and controlled by Conway, Mountain Manor Realty, Inc. (Realty), purchased the property upon which MMI operated the rehabilitation center, and on June 10, 1977, it entered into a ten-year lease with MMI. At that time, Conway had no financial interest in MMI and was not connected with its management.

On July 6, 1977, Conway was elected a director of MMI. In June, 1978, he and one E. Gordon Leatherman assumed control of the company by buying out all of the stockholders except Roby. As a result of those purchases, the MMI stock was owned as follows: Conway, 22 shares; Leatherman, 22 shares; Roby, 12 shares.

Leatherman managed the day-to-day affairs of the company until May, 1980, when Conway was elected president and assumed active command. Conway, Leatherman, and Roby constituted the Board of Directors.

At some point — perhaps because of the way Leatherman had been managing the company — Conway became disenchanted with his investment and began to look for someone to buy his stock. In January, 1980, he signed a letter promising Roby a five percent commission if he (Roby) obtained a buyer. Through Roby, Conway was introduced to

Jean Buccheri and Joseph Francus. In September, 1980, Conway agreed to sell his stock to them for $5,400 a share; but, because of the failure of certain conditions, the sale was not consummated.

Buccheri and Conway continued their discussions, but never came to terms. Unknown to Conway, Buccheri was also negotiating with Roby and Leatherman, who previously had declined to sell their stock. On September 15, 1981 — about a year after the aborted sale of Conway's stock — Buccheri bought Leatherman's 22 shares and Roby's 12 shares. This bit of news was communicated to Conway in a letter from Buccheri's counsel. The letter was accompanied by the resignations of Leatherman and Roby as directors and included a request that the corporate records be changed to reflect the sale and that a special meeting of stockholders be called.

Conway challenged the sale of Roby's 12 shares, contending that it was in contravention of the 1974 stockholders' agreement, to which Roby was a party. He dutifully called a special stockholders meeting for October 23, 1981, however, stating in the notice that the meeting was called "for the purpose of electing directors of the Corpora-tion and such other business as may properly come before the meeting, it being understood that the matter of ownership of the stock of the corporation will be addressed at such special meeting."

In an effort to retain control of the corporation, which control he was likely to lose on October 23, Conway, without notice to Buccheri, Leatherman, or Roby, called a special meeting of directors for October 22, 1981, in Easton, Maryland.[1] At the time, of course, by reason of the resignations of Leatherman and Roby, he was the only remaining director. He invited to this meeting his attorney and two acquaintances — Margaret Faulstich, who had been one of MMI's initial stockholders, and William C. Widman, an insurance agent who had placed some insurance for MMI.

---

1. The corporation's principal office was in Sykesville, although, by virtue of Art. II, § 5 of the by-laws, directors meetings could be held anywhere.

The minutes of that meeting show that Conway made a long and detailed presentation about the history, the affairs, and the current condition of the company, and about the importance of directors exercising independent judgment. The "upshot" of the meeting was that

(1) Conway, as sole surviving director, elected Faulstich and Widman as directors to fill the vacancies created by the resignations of Leatherman and Roby;

(2) Conway then presented to this newly constituted board an offer by Realty to purchase 13 shares of MMI stock at a price of $7,000 a share, the purchase price to be paid by means of a credit of $91,000 against the arrearage of rent due by MMI to Realty on the lease. The price was subject to upward adjustment to match the price paid by Buccheri for Roby's stock if that price was more than $7,000 a share;

(3) The board accepted the offer and authorized the issuance of the 13 shares to Realty; and

(4) Realty executed a "Credit Toward Rent," which was delivered to MMI, and MMI issued stock certificate no. 14, evidencing 13 shares to Realty.

At the stockholders meeting the next day, which was attended by Buccheri and Roby, Conway announced first that the company did not recognize the sale of Roby's 12 shares. He then distributed copies of the minutes of the October 22 directors meeting showing the sale of the 13 shares to Realty. Purporting to vote 35 shares (his 22 and Realty's 13), Conway thereupon nominated himself, Faulstich, and Widman as directors. Counsel for Buccheri, who was also in attendance, disputed the validity of Realty's 13 shares; and, on the authority of the 34 shares owned by Buccheri, or by Buccheri and Roby, Buccheri nominated a different slate. The vote was either 35-34 in favor of Conway's slate or 34-22 in favor of the Buccheri slate, depending upon the validity of the 13 shares sold to Realty.[2]

---

2. As Roby was present and voted the 12 shares that Conway claimed had never been properly sold to Buccheri, there is no question but that 34 votes were properly cast for the Buccheri slate.

Upon the assumption that he had won, Conway declared the meeting adjourned.

Conway's confidence in his victory was apparently not complete. On November 5, 1981, he filed an action in the Circuit Court for Frederick County seeking a declaratory judgment that (1) because it contravened the 1974 stockholders agreement, the sale of Roby's 12 shares to Buccheri was invalid and Buccheri was therefore not the lawful owner of those 12 shares, (2) 13 shares of MMI stock were validly issued to Realty on October 22, 1981, and (3) the corporate directors were Conway, Faulstich, and Widman.

On August 3, 1982, the court gave Conway a meaningless partial victory. It declared that Roby had in fact signed the 1974 stockholders agreement, that his 12 shares were subject to it, that the sale of those shares to Buccheri was not in accordance with the agreement, and that Buccheri therefore did not own those shares. The court also declared, however, that the 13 shares "were not legally issued to the Realty Company on October 22, 1981, because the transaction of [Conway] at the meeting of October 22, 1981, was completely illegal." It explained:

"Sec. 2-408B of the Corporations and Associations Article of the *Annotated Code of Maryland* provides as follows:

'b. Quorum — (1) Unless the By-Laws of the corporation provide otherwise, majority of the entire board of directors constitutes a forum for transaction of business.

(2) Notwithstanding any provision of the By-Laws to the contrary, a quorum may not be less than:

(i) One-third of the entire board of directors or

(ii) Two directors.'

Dr. Conway individually could not transact any business of the corporation as a sole stockholder because he would be in violation of the above statute. Furthermore, Dr. Conway's action at the meeting on October 22, 1981, was not in the best interest of the corporation for the reason that the control of the corporation was manipulated by sale of the stock to himself without regard of *[sic]* a stockholders meeting to be held in a couple of days for the purpose of electing new directors. It is inconceivable to this Court that such action would be orchestrated and then ask the Court to apply its stamp of approval."

From that conclusion, the court declared that Conway, Faulstich, and Widman did not constitute the directors of MMI.

Conway's appeal attacks both reasons advanced by the court for declaring the October 22 transaction invalid. He argues:

"I. Conway, as the sole remaining director of Mountain Manor, had the right to elect two directors to fill the vacancies on the Mountain Manor Board of Directors.

II. The transaction by which Realty acquired 13 shares of Mountain Manor stock complied with Md. Corp. & Ass'ns Code Ann. § 2-419 which governs interested director transactions, and thus the stock was validly issued to Realty."

Although we do not necessarily recommend the procedures employed by Conway to retain control of the company (any more than we recommend the secret double-dealing between Roby and Buccheri), we think, for the reasons that follow, that the court may have erred in declaring the October 22 transaction to be invalid.[3]

---

3. No appeal was taken from that part of the judgment dealing with Roby's 12 shares.

The court's action with respect to the 13 shares issued to Realty rested, as we have seen, on two bases: (1) that Conway "could not transact any business of the corporation as a sole stockholder" because of the quorum requirements of Md. Code Ann. Corp. and Ass'ns art., § 2-408 (b); [4] and (2) that the transaction was not in the best interest of MMI because "control of the corporation was manipulated by sale of the stock to himself without regard of *[sic]* a stockholders meeting to be held in a couple days. . . ."

As to the first of these reasons, we note initially that Conway did not purport to act as "a sole stockholder," which, of course, he was not, but rather as the sole surviving director, which, of course, he was. More important, § 2-408 (b) is not the only relevant statute.

Section 2-402 (a) requires that a corporation "shall have at least three directors at all times." The number of directors may be greater than three, as established in the charter or the by-laws, but it may not be less than three. MMI, it was agreed, had three directors.[5] As the court correctly observed, § 2-408 (b) provides that, absent a contrary provision in the by-laws, a majority of the entire board of directors constitutes a quorum for the transaction of business, but that in no event may a quorum be less than "(i) One third of the entire board of directors; or (ii) Two directors."

What the court omitted to consider, however, was § 2-407 (a) (2) (i), dealing with vacancies on the board of directors. That subsection states:

"Unless the bylaws provide otherwise: . . . [a] majority of the remaining directors, *whether or not sufficient to constitute a quorum,* may fill a vacancy on

---

4. The court's reference to § 2-408B is evidently a typographical error. The language quoted appears in § 2-408 (b).

5. The charter provides for six directors, subject to increase or decrease pursuant to the by-laws. The by-laws permit up to fifteen directors. The record indicates, however, that the corporation actually had three directors, and that, until the resignations of September 15, 1981, the board consisted of Conway, Leatherman, and Roby.

the board of directors which results from any cause except an increase in the number of directors." (Emphasis supplied.) [6]

MMI's by-laws are not contrary to that provision; indeed, they track it. Article II, § 9, dealing with vacancies on the board of directors, provides, in relevant part, that,

"If any director shall die or resign . . . a majority of the remaining directors *(although such majority is less than a quorum)* may elect a successor to hold office for the unexpired portion of the term of the director whose place shall so become vacant, and until his successor shall have been fully chosen and qualified." (Emphasis supplied.)

With the resignations of Roby and Leatherman, Conway, being the only remaining director and thus necessarily "a majority of the remaining directors," had the authority under § 2-407 (a) (2) (i) and art. II, § 9 of the by-laws to fill the two vacancies, notwithstanding that under § 2-408 (b) there was the lack of a quorum. There being no challenge here to the qualifications of Faulstich and Widman, or *otherwise* to the procedure of their election, we perceive no legal impropriety in their election on October 22 as successor directors.

With regard to the second stage — the issuance of the stock — the matter is not so clear. We think that the court applied the wrong standard in judging that issue, and we therefore cannot affirm its judgment. We recognize, however, that the same ultimate conclusion *might* properly flow from application of the correct standard; and so neither shall we reverse. We shall, instead, remand under Md. Rule 1071.

To put the matter in its proper perspective, we note first the general rule that, with but limited exceptions, a court may not interfere with or second-guess the business deci-

---

**6.** Section 2-407 (b) goes on to state that "[a] director elected by the board of directors to fill a vacancy serves until the next annual meeting of stockholders and until his successor is elected and qualifies."

sions made by the directors of a corporation in their management of the corporation. As stated in *Parish v. Milk Producers Assn.,* 250 Md. 24, 74 (1968), and reaffirmed several times since,

> "It is well established that courts generally will not interfere with the internal management of a corporation at the request of a minority stockholder or a member. The conduct of the corporation's affairs [is] placed in the hands of the board of directors and if the majority of the board *properly* exercises its business judgment, the directors are not ordinarily liable." (Emphasis supplied.)

The key word, of course, is "properly." Although courts are generally enjoined from substituting their judgment for that of the directors as to the economic wisdom of business decisions made by the board, they can, in an appropriate case, examine whether, in making those decisions, the directors abided by the relevant ground rules. Thus, it has been held that directors may be held liable — *i.e.,* courts may intervene — "if they permit the funds of the corporation or the corporate property to be lost or wasted by their gross or culpable negligence." *Parish, supra,* at 74; *Devereux v. Berger,* 264 Md. 20, 32 (1971). In addition, as we shall see, a court may intervene to prevent (or annul) conduct on the part of directors that is fraudulent or represents a breach of their fiduciary obligations. *See, for example, Chesapeake Constr. Corp. v. Rodman,* 256 Md. 531 (1970); *Llewellyn v. Queen City Dairy,* 187 Md. 49 (1946).

Against that standard of noninterference, three facts are also worthy of note, to wit:

(1) No suggestion has been made in this appeal, and no finding was made by the court, that the issuance of the 13 shares was in violation of State or Federal securities laws. In particular, no violation of Md. Code Ann. Corp. & Ass'ns art., § 11-301 was claimed, proved, or declared.

(2) No suggestion has been made in this appeal, and no finding was made by the court, that the consideration for

that stock — $7,000 a share paid through a credit against an existing arrearage of rent — was either invalid or inadequate. The record shows that the arrearage existed and that the price was equal to that agreed upon between Buccheri and Roby for the latter's 12 shares. Nor have appellees controverted the plain fact that, as a result of that transaction, the corporation, which was not in the best financial condition, was enriched by the sum of $91,000; it shed a current liability in that amount which it was apparently unable to pay.

(3) Although appellees obliquely suggest a violation of Corp. & Ass'ns art., § 2-419, governing transactions between a corporation and its director(s) (or entities controlled by the director(s)), no such violation was found by the court, and no such violation appears from the evidence. Indeed, the record would indicate that, under § 2-419, the transaction between MMI and Realty would not be invalid by reason of Conway's common interest in both entities. *Compare Ross Transport, Inc. v. Crothers,* 185 Md. 573 (1946), decided under the law as it existed before the enactment of § 2-419.

The court's concern, and the foul cried by appellees, relate not so much to MMI as a corporate entity as they do to the relative positions of the competing stockholders. Their complaint is that, by what occurred on October 22, Conway has, in effect, acted in derogation of the principle of "majority rule."

There are two answers to that complaint, the first of which is that, as of October 22, it was not at all clear who the "majority" was. Buccheri asserted a majority interest by virtue of her purchase of 34 shares; but, as we have seen, 12 of those shares — the 12 needed to give her that majority — were invalidly transferred. Conway recognized that, and indeed warned Buccheri that the transfer would not be recognized. As of October 22, therefore, Buccheri was not legally in command of a majority of the stock; and, *as of then,* one could only speculate as to what Roby might do once the invalidity of the transfer became apparent to him.

Even if we were to assume, however, as later turned out to be the case, that Roby and Buccheri would act in concert, and that Conway's machinations thus thwarted the intended takeover of corporate control by them, we still think that the court *may have* erred in declaring such actions invalid.

The Maryland law in this regard was set forth in *Cummings v. United Artists,* 237 Md. 1 (1964). The plaintiff there (Cummings) was a substantial stockholder in United Artists who, in part through a proxy fight, was engaged in an effort to gain control of the company. In June, 1963, he requested that the board of directors call a special stockholders meeting for July 30, 1963, for the purpose of removing most of the incumbent directors and electing successors. The board ignored that request, and, instead, at a special meeting of directors held on August 7, 1963, approved an agreement for the exchange of United Artists stock for the stock of another company with which United Artists had a current affiliation. One effect of that agreement was to preclude Cummings from obtaining control of United Artists by giving 46% of the stock to the group then in control of the affiliated company.

Cummings sued to enjoin United Artists from implementing the agreement, claiming that its purpose was merely to frustrate a change in corporate management, that its principal motivation was thus a wrongful manipulation of control, and that it flowed from the wrongful refusal to call a special stockholders meeting.

Though acknowledging that the board's refusal to call the requested stockholders meeting was improper and that the effect of the agreement was to frustrate Cummings' plan to acquire control of United Artists, the Court nevertheless refused to upset the board's approval of the agreement, as it found that the action was taken in good faith and that the agreement served a valid business purpose. The principle laid down by the Court was that a transaction authorized by the directors of a corporation which is otherwise fair and which serves a legitimate corporate purpose is not invalid merely because one of the motives behind it is the manipula-

tion of control of the corporation. At best, said the Court at p. 21, "if manipulation for control is a *primary or principal* motivation for board action the transaction *may* be invalid." (Emphasis supplied.)

In *Heit v. Baird,* 567 F.2d 1157, 1161 (1st Cir. 1977), the rule was stated somewhat differently:

> "Directors may not exploit their official position to manipulate the issue of shares *solely* to perpetuate their own control of the corporation.... But an issue of stock that has the collateral effect of enhancing the power of incumbent management is not invalid if the transaction has as its principal purpose some proper corporate goal.... And management has not only the right but the duty to resist by all lawful means persons whose attempt to win control of the corporation, if successful, would harm the corporate enterprise." (Emphasis supplied.)

The *Cummings* principle was noted and applied in another case of intricate corporate manipulation, *Martin Marietta Corp. v. Bendix Corp.,* 549 F.Supp. 623 (D.Md. 1982). The Court there was presented with a petition by Bendix, which regarded itself as the majority stockholder in Martin Marietta, to enjoin the Martin Marietta board of directors from issuing a tender offer for a majority of Bendix shares, claiming that the offer was manipulative and a violation of the board's fiduciary duty to the Martin Marietta stockholders. The Court found no such violation and denied the petition. In footnote 5, at p. 633, it had this to say:

> "Bendix relies heavily on *Cummings v. United Artists Theatre Circuit, Inc.,* 237 Md. 1, 204 A.2d 795 (1964), for the proposition that normally a board of directors may not take action known to be disapproved by the majority of stockholders. *Cummings* does not stand for this proposition nor, as far as this Court is aware, does any other Maryland case. Rather, *Cummings* does quote

Judge Learned Hand to the effect that directors 'one day before they know they are to be displaced' cannot normally take actions contrary to their majority shareholders.... Despite Judge Hand's words, there is no reason to believe that a Maryland corporation's directors, even faced with a request from a majority shareholder, must always accede to that request. *See* Md. Corps. & Ass'ns. Code § 2-401 (b) ('The board of directors may exercise all the powers of the corporation, except those conferred on or reserved *to the stockholders* by law or by the charter or bylaws of the corporation')."

On that analysis, the Court regarded Bendix's hypothesis that "Maryland law requires a board of directors to accede to the wishes of a majority shareholder" as a "doubtful proposition." *Id.* at 633.

Whatever the law may be elsewhere, it seems fairly clear that in Maryland stock issuances which have the effect of consolidating or perpetuating management control are not necessarily invalid. They are, instead, to be examined under a sort of balancing test; assuming that the transaction is legal in all other respects — that it complies, for example, with the standards set forth in § 2-419 — the court must look to see if there was any legitimate business purpose for the transaction other than the self-interest of the directors. If it finds such a purpose, under *Cummings* it would then have to determine whether that independent purpose was a primary or principal one, or whether, conversely, the primary object was merely to manipulate control.[7]

---

7. We recognize that that latter determination — of assessing which among several business motivations (which may vary from director to director) was the principal or primary one — may not be an easy one to make. Being subjective in nature, it may require judgments as to credibility of the various actors. Motive, of course, may be inferred from the effect of a transaction, and the court may therefore give weight to the actual benefits conferred by or flowing from the challenged decision, to both the corporation and the interested directors, in determining the motivation behind it. *See, for example, Treadway Companies, Inc. v. Care Corp.,* 638 F.2d 357 (2d Cir. 1980), where the Court subjected a transaction of this type to the normal "business judgment analysis" standard.

A relative motivation test, as adopted in *Cummings* and *Heit,* is, of course, inconsistent with that urged by appellees and apparently applied by the court below. The court, as we have observed, declared the transaction not to be in the best interest of the corporation "for the reason that the control of the corporation was manipulated by sale of the stock [by Dr. Conway] to himself without regard of *[sic]* a stockholders meeting to be held in a couple days. . . ." No account was taken of the collateral benefits flowing to MMI from the sale, and no finding was made as to the motivation of the *three* directors — not just Conway — who voted to accept Realty's offer.[8] The court seemed to apply a type of *"ipso facto"* test — if the result was manipulation of control, the transaction is invalid; and that is not what the Maryland law requires.

The determinations required under *Cummings* are, to a large extent, factual ones which must be made by the trial court. The most appropriate action, therefore, would be to remand the case to the circuit court for the making of those determinations. If the court finds that the transaction was, on the whole, motivated by a legitimate corporate purpose, it should declare the sale to be valid; if it finds to the contrary — that the purpose of the transaction was primarily one of management's self-perpetuation and that that purpose outweighed any other legitimate business purpose — it should declare the sale to be invalid.

> *Judgment as to issues 1e and 1f neither affirmed nor reversed; case remanded pursuant to Md. Rule 1071 for further proceedings; appellees to pay the costs.*

---

**8.** We note that Mrs. Faulstich testified that she was aware that "one of the purposes" in issuing the 13 shares was to maintain control in Dr. Conway, but that she saw nothing wrong with that and that her vote on the matter was the independent exercise of her judgment without influence from Conway.