Bob GILDER; Ken Green; John Inman; Rafe Botts; Bob Erickson; George Lanning; Dean Refram; Walter Zembreski; Agim Bardha; Karsten Manufacturing Corporation, an Arizona corporation, Plaintiffs,

v.

PGA TOUR, INC., a Maryland nonprofit corporation; Deane R. Beman; E. Mandell deWindt; Roger E. Birk; Hugh E. Culverhouse, Defendants.

No. CIV 89–1980 PHX PGR.

United States District Court, D. Arizona.

Dec. 26, 1989.

Leonard Decof, Decof & Grimm, Providence, R.I., Daniel Cracchiolo, Burch & Cracchiolo, P.A., Harry J. Cavanagh, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A., Phoenix, Ariz., for plaintiffs.

William F. Bennett, Case & Bennett, Scottsdale, Ariz., Jerry Markham, Rogers & Wells, Washington, D.C., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND PRELIMINARY INJUNCTION

ROSENBLATT, District Judge.

### FINDINGS OF FACT

1. The Plaintiffs are nine professional golfers and members of PGA Tour, Inc. and Karsten Manufacturing Corporation, an Arizona corporation, which designs, manufactures, markets, and sells PING

EYE2 iron golf clubs with U-shaped grooves ("PING EYE2" clubs).

2. The Defendants are the PGA Tour, Inc. ("Tour"), Deane A. Beman, the Commissioner and Chief Executive Officer of Tour, E. Mandell deWindt, Roger E. Birk, and Hugh E. Culverhouse, members of the PGA Tour Tournament Policy Board ("Board"). The Tour co-sponsors and coordinates professional golf tournaments in various states including Arizona. There are approximately 200 professional golfers who play in Tour-sponsored events.

3. The Tour is governed by the Board which is composed of 10 directors. Four of the Board directors are professional golfers who compete on the Tour as direct competitors of Plaintiffs Green, Gilder and Inman. Three of the directors are officers of the Professional Golf Association of America, and three are outside directors who are businessmen, not professional golfers.

4. The Tour By-Laws, prior to December 5, 1989, provided that in all matters other than the amendment of the By-Laws, decisions were to be made by a majority of the directors present in person at the meeting, a quorum being present. The Tour's Tournament Regulations required amendments to such regulations to have the affirmative vote of a majority of the Board, including not less than three of the four player directors.

5. At the Board meeting on February 28, 1989, with all directors present, the Tour V ™–Rule was passed, requiring the use of traditional V-grooves in irons and concomitantly prohibiting the use of U-groove irons in Tour-sanctioned events commencing January 1, 1990. Seven of the Board members abstained from voting on adoption of the regulation based upon advice of Tour's counsel, because of possible conflicts of interest. Only the three outside directors voted in favor of the resolution.

6. The validity of the Board's action in contravention of its own By-Laws and Tournament Regulations has been challenged by the Plaintiffs' Complaint filed December 1, 1989. There is a serious question as to this issue which should be resolved at a hearing on the merits.

7. The By-Laws of Tour can be amended only by the unanimous consent of all directors. Upon receiving copies of Plaintiffs' Complaint, Defendant Beman gave two days' notice to the members of the Board of a special meeting to be held for the express purpose of amending Tour's By-Laws to enable Tour to re-pass the Tour V ™–Rule challenged by Plaintiffs.

8. On December 5, 1989, the Board held its special meeting at which the Board voted unanimously to amend its By-Laws to permit amendments to Tournament Regulations by a majority of members actually voting, without considering the vote of those members who abstain because of an actual or potential conflict of interest. The effect of this amendment was to eliminate the requirements that a majority of a quorum present approve the amendment of a Tournament Regulation and that the approval include the affirmative vote of at least three of the four player directors. At the time of the unanimous vote to amend the By-Laws, the directors were fully aware that the amendment was for the purpose of allowing the three outside directors to adopt the Tour V ™–Rule banning U-groove irons.

9. At the December 5, 1989 Board meeting, following the amendments to the By-Laws and Tournament Regulations, only the three outside directors again voted to adopt the Tour V ™–Rule. The remaining seven Board members abstained from voting, declaring they had conflicts of interest.

10. Following the actions of the Board on December 5, 1989, Plaintiffs filed an Amended Complaint in which they challenged the validity of the Board's actions at the December 5, 1989 meeting. Plaintiffs allege that the vote to amend the By-Laws by seven directors admitting a conflict of interest on the issue of the U-groove ban is improper and void in that the directors were effectively voting to permit the Tour V ™–Rule to be adopted. There is a serious question as to this issue which should be resolved at a hearing on the merits.

11. The Tour Regulations provide that tournaments co-sponsored by the Tour shall be conducted in accordance with the United States Golf Association ("USGA") Rules of Golf, except as modified by Tour. Since January 1, 1984, both the Tour and the USGA have permitted the use of both V-shaped grooves and U-shaped grooves in iron golf clubs.

12. Plaintiff Karsten manufactures and sells only PING EYE2 clubs with U-grooves. Most other golf club manufacturers market both V-groove and U-groove irons.

13. There is a dispute as to whether U-grooves impart more spin to a ball than V-grooves under certain conditions with higher lofted clubs. This is a serious question which should be resolved at a hearing on the merits.

14. There is no evidence that groove shape significantly affects ball spin with the 1 through 6 irons.

15. Whether or not U-shaped grooves have changed the nature of the game is a serious question which should be resolved at a hearing on the merits.

16. The player Plaintiffs will be irreparably harmed if they are forced to abandon their PING EYE2 clubs and use different clubs in that they would have a competitive disadvantage due to playing with clubs to which they were unaccustomed and in which they had no confidence. This would adversely affect their physical and mental capacity to play the game and to compete to the best of their ability.

17. The ability to use the clubs of their choice would likely affect Plaintiffs' placement in Tour-sponsored tournaments. Placement and winnings from tournaments are the measure for qualifying for future events. If prevented from using the clubs of their choice pending a determination of the merits of this action, Plaintiffs may not be able to maintain their competitive position. In addition, Plaintiffs would not be able to ascertain their damages because they could not prove they would have won more money using PING EYE2's.

18. The sand wedge, a major innovation introduced approximately 50 years ago, has never been banned by the Tour or the USGA Rules of Golf. There is a question raised as to the degree to which technological advances in golf equipment should be limited and the point at which the "integrity of the game" should be frozen.

19. Whether amateur golfers like to use the same equipment as professional golfers, their "heroes", and whether use of golf clubs by the public correlates to the use of golf clubs by Tour professionals is a serious question that should be resolved at a hearing on the merits.

20. Since enactment of the Tour ban of U-groove clubs on February 28, 1989, a number of players on the Tour have stopped using PING EYE2 clubs. During this same period, Plaintiff Karsten claims its market share of iron golf club sales has dropped from 28.2% to 20.9%, and that there has been a corresponding drop in the sales of all PING equipment, including putters, wood clubs, and golf bags, as well as other items not banned by the Tour V ™–Rule. Whether that decline in Karsten's shares of golf club sales and other product sales is the result of a fashion change by the golfing public and not necessarily related to the U-groove debate is a serious question that should be resolved at a hearing on the merits.

21. If the question in the preceding paragraph is resolved in Karsten's favor, then the decreased market share in the sale of PING EYE2's and other PING-related golf equipment following the February 28, 1989 ban demonstrates that Karsten's reputation has been adversely affected as a consequence of the ban and there has been harm to the brand-name PING. This reputational harm cannot, at this time, be quantified in terms of money.

22. The percentage of professional golfers on the tour using PING EYE2 U-groove clubs would drop to zero on January 1, 1990 if the ban is permitted to take effect.

23. Unless an injunction is issued pending a determination of this case on the merits, Plaintiff Karsten will be required to

design new irons and re-tool its manufacturing process to conform to the Tour V ™-Rule. To convert to V-grooves from the popularly-accepted U-grooves would seriously harm the sale of PING EYE2 clubs which have heretofore established a significant share of the market. Karsten would be abandoning a high quality product and an established market to produce a product already being produced by other manufacturers.

24. During the 1988 Tour year, Karsten provided a $1,000,000 pool to be shared by players using PING EYE2 clubs based on their Tour results. If the Tour V ™-Rule becomes effective on January 1, 1990, this million dollar pool will be unavailable for distribution to players on the Tour, including the individual Plaintiffs.

25. Karsten claims that as its share of the market decreases, other manufacturers' shares will increase to fill the void and that the increased demand for the golf clubs of other manufacturers will cause the prices of their products to rise. This is a serious question that should be resolved at a hearing on the merits.

26. The Tour's claim of harm if the injunction is issued is based on its claim that its reputation as a sports governing body will be damaged. There are substantial questions as to whether the USGA or the Tour is the proper rulemaker for the sport of golf.

27. The Plaintiffs have pursued their action with reasonable diligence.

### CONCLUSIONS OF LAW

Based on the foregoing, the Court turns to the legal standard for a preliminary injunction adopted in the Ninth Circuit, which requires Plaintiffs to assume the burden of demonstrating either a combination of reasonable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in plaintiffs' favor.

#### A. *Likelihood of Success on the Merits*

The Court concludes the evidence has shown there is a reasonable chance of success on the merits of Plaintiffs' claims. Insofar as the conduct of the PGA TOUR, Inc. at the February 28, 1989 Board meeting, it is clear that the vote did not comply with the By-Laws of the PGA Tour, Inc. by the fact that only three Board members voted to enact the Tour V ™-Rule. As to the December 5, 1989 Board meeting, the Court considers the argument that this second vote on the V-groove issue was arguably remedial and balances that against the argument that the vote can be seen as an acknowledgement by Defendants that the Tour V ™-Rule was a defective enactment. An inquiry must be made into whether or not the Board members who abstained from the ultimate vote on the Tour V ™-Rule based on a conflict of interest could participate in a By-Law change that was clearly intended to provide the same result.

In addition, there are other questions of fact, as indicated in the foregoing Findings of Fact, which must be resolved at a hearing on the merits.

#### B. *Threat of Irreparable Harm*

The Court concludes there would be irreparable harm to the individual Plaintiffs as well as the corporate Plaintiff if the injunction is not imposed. The remedy available to Plaintiffs in the event it is proven to the trier of fact that antitrust laws have been violated and the conduct of the PGA Tour, Inc. was not reasonable cannot simply be compensated in money damages.

The Court has considered evidence of damage to reputation, the fact that the corporate Plaintiff has already lost some of its market share, and that there is a strong likelihood the consuming public emulates the equipment choice of professional golfers. The Court has also considered conflicting evidence as to the harm which may or may not be suffered by the individual Plaintiffs and concludes that irreparable harm will inure if the injunction is not imposed.

#### C. *Balance of Hardships*

The Court acknowledges that it does not substitute its independent judgment for the

judgment of the sports governing body as long as the rule adopted is reasonable, without self-interest or self-dealing among the decision-makers, and where those affected have had some opportunity for input into the decision-making process. Assessing the balance of harm to Defendants if the injunction is imposed, the Court has considered whether the rule-making authority of PGA Tour, Inc. would be significantly tainted or whether there would be a substantial loss of confidence in the Tour's ability to regulate its affairs. The Court concludes that the balance of hardships tips sharply in favor of Plaintiffs where, without an injunction, the corporate Plaintiff would be required to design new irons and re-tool its manufacturing process and abandon its established U-groove market. Furthermore, there is evidence that the ability of individual Plaintiffs to compete as professional golfers would be impaired pending a determination on the merits of this case. The grant of a preliminary injunction will serve to preserve the status quo which has permitted the use of U-groove clubs in Tour-sanctioned events since 1984.

### D. *The Seriousness of the Question*

The Court concludes that the issues raised in this action are important matters to the golfing public. Testimony presented to the Court indicates that millions of individuals as well as the 200 very best golfers who are members of the Professional Golfers Association of America are affected by the outcome of this case.

Applying the traditional factors to the two-part test for the grant of a preliminary injunction, the Court concludes there is a reasonable possibility of success on the merits and there is a great possibility of irreparable harm to Plaintiffs if an injunction is not granted. The balance of hardships tips sharply in favor of Plaintiffs.

IT IS HEREBY ORDERED that the defendants PGA Tour, Inc., its officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise are preliminarily enjoined, pending the outcome on the merits from prohibiting the use of U-groove irons by enforcing, enacting or implementing the so-called PGA Tour V ™–Rule adopted by its TOUR Tournament Policy Board at its meetings on February 28, 1989 and December 5, 1989, or otherwise, and from enacting, adopting or implementing any other regulation, rule or resolution which would have the same effect or nullify the effect of this Preliminary Injunction.

IT IS FURTHER ORDERED that pending the Court's decision on the merits, the plaintiffs post a bond in the amount of $100,000.00.