Bob GILDER, Ken Green, John Inman,
Rafe Botts, et al., Plaintiffs–Appellees,

v.

PGA TOUR, INC., a Maryland
Nonprofit Corporation,
Defendant–Appellant.

No. 89–16725.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 1, 1991.

Decided June 12, 1991.

Leonard Decof, Decof & Grimm, Providence, R.I., Daniel Cracchiolo, Jack D. Klausner, Marigene Dessaint, Burch & Cracchiolo, Harry J. Cavanagh, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A., Phoenix, Ariz., for plaintiffs-appellees.

Thomas J. McDermott, Jr., Rogers & Wells Roger A. Clark, Jerry W. Markham, Geoffrey C. Jarvis, Rita McCloy Stephanz, Washington, D.C., Rogers & Wells, Charles R. Hartman, III, Los Angeles, Cal., Case & Bennett, William F. Bennett, Scottsdale, Ariz. (Edward L. Moorhouse General Counsel Ponte Vedra Beach, Fla., of counsel), for defendant-appellant.

Before TANG, FARRIS and D.W. NELSON, Circuit Judges.

TANG, Circuit Judge:

Karsten Manufacturing Corporation and eight professional golf players challenge the implementation of a new rule by the PGA Tour (PGA) banning clubs with U-shaped grooves. Karsten and the professional player plaintiffs challenge the actions of the PGA on antitrust and state law grounds. After a three day hearing, the district court granted a preliminary injunction enjoining the PGA from implementing the rule. 727 F.Supp. 1333. The PGA appeals. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This action concerns a rule change implemented by the PGA that bans all clubs on which the cross-section of the grooves on the face of the club is in the shape of a square or "U" as opposed to a "V":

## U-grooves

## V-grooves

Karsten Manufacturing Corporation (Karsten) designs, manufactures, and sells a variety of golf equipment including: putters, woods, golf bags and "Ping Eye 2" golf clubs. All of Karsten's Ping Eye 2 golf clubs have U-shaped grooves. Karsten's Ping Eye 2 golf clubs are top selling clubs in the United States for both professional and amateur players. Karsten's marketing strategy is that it supplies the same equipment to the amateur as to the professional. Karsten maintains that the U-groove rule will harm its reputation if it is forced to make what the company feels is an inferior product with V-grooves.

Bob Gilder and the seven other plaintiffs in this action are eight professional golfers who are members of the PGA. Each of the eight professionals players uses Karsten's Ping Eye 2 clubs on the Tour. Karsten is paying the attorney's fees for these players.

The defendants in this action are the PGA; Dean A. Beman, the Commissioner and Chief Executive Officer of the PGA; and E. Mandell deWindt, Roger E. Birk, and Hugh E. Culverhouse, members of the PGA Tour Tournament Policy Board. The PGA is the organization which administers professional golf tournaments for the regular Tour and the Senior Tour.

The PGA Policy Board is composed of ten directors. Four of the directors are players elected from the membership of the PGA. The board also includes three officers of the PGA of America and three independent directors with no ties to golf. The independent directors volunteer their time.

In 1984, the United States Golf Association (USGA) changed the rules of golf to allow grooves in the shape of a U. Karsten developed its U-groove club. In 1985, players on the Tour began to complain that the U-groove golf clubs were detracting

from the skill level of the game. These players complained that the U-grooves imparted more spin on the golf ball and thus provided greater control for shots from grassy lies of the rough. This characteristic offsets the advantage of players with the skill necessary to keep the golf shot in the fairways.[1]

In January 1987, the USGA conducted tests and concluded that the U-grooves impart more spin on the ball than V-grooves. However, in June 1987, the USGA concluded that there was not enough information to bar clubs with the U-grooves.[2]

On August 10, 1987, the PGA released the results of an equipment survey. One hundred seventy-one of the two hundred golfers on the tour had responded. Of those, seventy-three percent responded that they used U-groove clubs. When asked the advantages of the club, seventy-four percent indicated that the grooves provide for greater control from the wet grass and rough. When asked if the PGA should ban the U-groove, sixty percent responded in the affirmative.

In September 1987, Commissioner Beman wrote to all the golf club manufacturers advising them that the PGA had engaged two technical experts to study the issue of the U-groove. The letter asked the manufacturers to provide pertinent information and relevant data. Karsten did not respond to this request.

In November of 1987, the independent testing expert conducted elaborate field tests trying to localize the effect of the groove. The PGA gave the resulting data to two separate consulting groups, one at the University of Texas and one at the University of Delaware. Each of the Universities devised its own methodology to interpret the data. Both studies concluded that the U-grooves impart more spin to the

golf ball than the V-grooves. Commissioner Beman testified that in the lesser lofted clubs,[3] the spin of the golf ball was affected to a much lesser extent, if at all.

On May 12, 1988, Commissioner Beman recommended to the board that a proposed rule change banning U-grooves be circulated for public comment. On May 24, 1988, the board accepted Beman's recommendation. The PGA received comments from some manufacturers and the PGA made some changes in the rule.

On August 16, 1988, the PGA deferred action on the proposed rule until the USGA conducted further player study. The USGA tests confirmed that balls hit from the rough with U-grooves have a different spin rate than those hit with V-grooves. The USGA determined, however, that the tests did not show a significant enough difference to ban the clubs with U-grooves.

Beman recommended that the PGA Policy Board adopt the U-groove ban. The PGA's bylaws at that time required a majority of the directors present and three of the player directors to vote on any rule change. At its February 28, 1989 meeting, the four player directors and the PGA officer directors abstained from voting because of conflicts of interest. Each of the abstaining directors had ties to golf club manufacturers. The three independent directors unanimously voted for the rule. The effective date of the rule was January 1, 1990.

Karsten contacted the PGA on June 23, 1989. Karsten met with the PGA to express its concerns on August 14, 1989. At that meeting, Karsten argued, based on its own testing, that the U-grooves do not affect the spin of the ball.

On August 11, 1989, Karsten sued the USGA challenging its June 1987 decision relating to the groove-to-land ratio which

---

1. The grass on the fairways is kept short enough to provide a good lie for the golf ball. The areas of the "rough" have taller grass which provides for a bad lie for the golf ball. A golfer in the fairway has an advantage over a golfer whose ball lands in the grassy area of the "rough."

2. The USGA did however adopt a new method for measuring the groove-to-land (space between the grooves) ratio which had the effect of banning the Ping Eye 2 clubs. Karsten and the USGA have settled their differences and Ping Eye 2 clubs are considered a conforming club for purposes of the USGA.

3. The five iron through the one iron.

had effectively banned Karsten's U-groove clubs. The USGA rule applied to USGA tournaments effective in 1990 and in all amateur tournaments in 1996. Karsten and the USGA have settled this law suit. Karsten filed the instant lawsuit against the PGA on December 1, 1989. The complaint sought injunctive relief and alleged that the actions of the PGA and its directors (1) violated sections 1 and 2 of the Sherman Anti–Trust Act, 15 U.S.C. §§ 1, 2; (2) violated the Arizona antitrust laws, Ariz.Rev.Stat. 44–1401 et seq.; and (3) interfered with the Karsten's and the professionals' business relationships. The complaint also charged the PGA directors with breaching their fiduciary duties and sought to hold them liable for their allegedly tortious conduct.

On December 5, 1989, all ten members of the PGA board met in a special session. At that meeting, all ten directors voted to change the by laws of the PGA so that the disinterested members could take binding action on behalf of the PGA policy board when the majority of the directors could not vote because of a conflict. The three disinterested directors then unanimously voted to readopt the groove rule.

Karsten's suit came on for an evidentiary hearing on December 15, 19, and 20, 1989. At the hearing, John Solheim, Karsten's Vice–President, testified that he believes that the U-grooves do not improve player performance.

At the hearing, Karsten presented an economist from Arizona State University, Dr. Richard Smith, who testified that the grooves have not had a negative effect on the PGA. Smith testified that the percentage of prize money that Ping Eye 2 players won is less than the percentage of players who used the Ping Eye 2 clubs. Thus, the Ping Eye 2 clubs do not give the players who use them an advantage. Smith also concluded that the Ping golf clubs do not help the players get their ball to the greens in less than regulation.[4] The expert testified that there is a correlation between a consumer's choice of golf clubs and the professional's choice of clubs.[5] Smith testified that Karsten had experienced a drop in its market share in its sales of golf clubs and other products because of the PGA ban of U-groove clubs. The PGA's expert challenged these last two assertions in his declaration. Smith testified that Karsten would experience harm to its reputation if forced to manufacture a club conforming to the PGA rule. Smith testified that the professional players would lose endorsements to the extent that the change in clubs adversely affects their performance on the Tour.

Two of the plaintiff players testified at the hearing. Bob Gilder testified that switching clubs would hurt his game, which in turn would affect his endorsement income. Gilder has been using Ping clubs since 1970. He likes the design and dynamics of the club. He cannot identify a difference in the club based on the shape of the grooves. He had switched to the Ping Eye 2 clubs in October of 1989. Gilder testified that he would probably use the Ping Eye 2 clubs with V-grooves if Karsten manufactured them.

George Lanning testified that he is a left-handed golfer. Lanning testified to his belief that Karsten makes the only quality left-handed clubs on the market. He further testified that he might lose his exemp-

4. "Regulation" is a term used to indicate the number of strokes it takes a golfer to reach the green on a particular hole. Regulation for each hole in golf is based on "par" for that hole. Par is the score expected of an expert golfer on a given hole and allows for two strokes on the putting green. Regulation is the number of strokes left after subtracting the two strokes on the putting green from par. For example, regulation on a par three hole is one. On a par five hole, regulation is three.

5. On cross-examination, the PGA brought out the fact that the professionals use a different ball than the average consumer. When asked why this does not affect the golf ball market, John Solheim responded that the professional's ball has a much shorter life span and thus is not economical for the average golfer. Additionally, John Solheim responded, the golf ball manufacturers do not advertise this distinction but concentrate on the name of the ball, not the actual type. By contrast, the U-groove has been extensively identified with Karsten and its Ping Eye 2 clubs.

tion card, which allows him to play on the Tour, if he is forced to change clubs.

Tom Kite, the all-time leading money winner on the Tour, testified that U-grooves diminished the skill factor of the game because the clubs offset the traditional advantage of being able to hit the ball in the fairway of the golf course.

Commissioner Beman testified that the issuance of the preliminary injunction would have dire consequences for the PGA. He testified that the PGA would not be able to propagate any rules for the professional tournaments that it oversees.

After this lengthy evidentiary hearing, the district court held that Karsten and the professional player plaintiffs had demonstrated that (1) they had a reasonable chance of success on the merits, (2) they would suffer irreparable injury if the injunction were not imposed, (3) the balance of hardships tips sharply in favor of the plaintiffs, and (4) there are serious questions for litigation. The PGA appeals.

## JURISDICTION

■■■ Although neither party contests subject matter jurisdiction, we are bound to address it *sua sponte* if it is questionable. *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1194 n. 2 (9th Cir.1988). Federal question jurisdiction in this case is premised on violations of the Sherman Anti–Trust Act 15 U.S.C. §§ 1 and 2. The jurisdictional basis of the state claims is pendent jurisdiction. Pendent jurisdiction exists where there is a sufficiently substantial federal claim to confer federal jurisdiction, and a common nucleus of operative fact between the state and federal claims. *Phelps v. Continental Illinois Nat'l Bank and Trust Co. (In re Nucorp Energy Sec. Litig.)*, 772 F.2d 1486, 1490 (9th Cir.1985). The facts giving rise to the pendent state claims for breach of the PGA director's fiduciary duties are identical to those which give rise to Karsten's and the professional plaintiffs' antitrust claims and thus arise out of a common nucleus of operative facts.

■■■ A federal claim is insubstantial if it is absolutely devoid of merit or obviously frivolous. *Id.* The ultimate lack of merit of the federal claim does not mean that such claim was not substantial for purposes of conferring jurisdiction. *Id.; Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 523 (9th Cir.1989). In this case, the antitrust claims allege that the actions of the PGA in banning the U-groove clubs amount to a boycott of Karsten's product and a restraint of competition with the individual players. We have jurisdiction over these anti-trust claims pursuant to 28 U.S.C. § 1337. We conclude that these antitrust claims are not insubstantial. *See e.g. Gunter Harz Sports, Inc. v. United States Tennis Ass'n*, 511 F.Supp. 1103, 1114–24 (D.Neb.1981), *aff'd*, 665 F.2d 222 (8th Cir.1981); *M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 980–87 (1st Cir.1984); *Blalock v. Ladies Professional Golf Ass'n*, 359 F.Supp. 1260, 1263–68 (N.D.Ga.1973).[6] Thus, we conclude that the district court had pendent jurisdiction over Karsten's and the professional plaintiffs' state claims.

■■■ When pendent jurisdiction is present, an injunction may issue on the basis of the pendent claims alone. *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1361–62 (9th Cir.1988) (en banc), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989). We review Karsten and the professional plaintiffs' pendent claims to determine if the district court abused its discretion in granting the injunction.

## STANDARD OF REVIEW

We will reverse a grant of a preliminary injunction "only where the district court abused its discretion or based its decision on an erroneous legal standard or clearly erroneous factual findings." *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir. 1990). Our standard of review recognizes that preliminary injunctions arise early in

---

**6.** We note that the parties have extensively briefed the antitrust issues raised in this case. We emphasize that we express no opinion on the antitrust issues other than they are not insubstantial.

the proceedings. "Because of the limited scope of our review of the law applied by the district court and because the fully developed factual record may be materially different from that initially before the district court, our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir.1982). Furthermore, our disposition of this appeal "will affect the rights of the parties only until the district court renders judgment on the merits of the case...." *Id.*

## DISCUSSION

In seeking a preliminary injunction, Karsten and the professional player plaintiffs must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in their favor. *Diamontiney*, 918 F.2d at 795. "The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

For purposes of injunctive relief, " 'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Republic of the Philippines*, 862 F.2d at 1362. "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.' " *Id.* (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2nd Cir.1953)). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.' " *Id.* (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir.1985)).

The PGA challenges the district court's analysis of (1) the balance of hardships, and (2) whether there are serious questions to be resolved on the merits. In applying the principles outlined above, we conclude that the district court did not abuse its discretion in granting the preliminary injunction.

### I. Balance of Hardships

The district court determined that the balance of hardships tips sharply in favor of Karsten and the professional player plaintiffs. The PGA disputes this finding, contending both that the possible harm to the PGA is substantial and the possible harm to Karsten and the professional player plaintiffs is minimal. The district court did not abuse its discretion on this issue.

### A. Harm to Karsten and the Professional Player Plaintiffs

The district court concluded that the professional player plaintiffs would be irreparably harmed if they were forced to abandon their Ping Eye 2 clubs and use different clubs. Testimony supported this conclusion. The players' testimony showed that the ban would affect the ability of the professional player plaintiffs to qualify in future tournaments and their ability to secure endorsements.

The PGA argues that the harm that the individual player plaintiffs suffered was purely speculative and thus could not be considered irreparable injury. PGA cites *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674–75 (9th Cir.1988) and *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir.1985) for the proposition that speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. In *Caribbean*, 844 F.2d at 675, and *Colorado River*, 776 F.2d at 849, the plaintiffs could not demonstrate any immediate threatened injury.

Here, the district court found that the professional player plaintiffs have demonstrated they will suffer an immediate threatened injury. The professionals will be irreparably harmed if they are forced to change clubs because they would be at a competitive disadvantage. They testified that the ban on clubs will force them to change their club selection and will have a detrimental effect on their golf game. They further testified that this forced club change would have an immediately discernible but unquantifiable adverse impact on their earnings, their ability to maintain their eligibility for the tour, and for endorsement contracts. This testimony was supported by cross-examination of Commissioner Beman and Tom Kite. The difficulty in quantifying the injury done to the professionals does not make their injuries speculative. *Treasure Valley Potato Bargaining Ass'n v. Ore–Ida Foods, Inc.*, 497 F.2d 203, 218 (9th Cir.), *cert. denied*, 419 U.S. 999, 95 S.Ct. 314, 42 L.Ed.2d 273 (1974). Additionally, where the threat of injury is imminent and the measure of that injury defies calculation, damages will not provide a remedy at law. *Id.* Thus, the immeasurable injuries likely to be suffered by the individual plaintiffs supports the district court's conclusion that they will be irreparably harmed. Therefore, the district court's conclusion that the professionals have established that they will suffer irreparable harm if the ban is enforced is not clearly erroneous.

With regard to Karsten Manufacturing, the district court found that Karsten would be required to redesign its clubs, retool its manufacturing process, and abandon its well-established U-groove market. Additionally, Karsten has produced evidence tending to show that the U-groove ban appears to have harmed Karsten's reputation as a golf club manufacturer.

PGA argues that Karsten has not demonstrated harm because the president of the company testified that customers do not rely on the grooves when they buy his clubs. This argument ignores testimony by John Solheim that Ping Eye 2 clubs have been identified with the U-groove. Secondly, Dr. Smith, Karsten's expert, tes-

tified that Karsten would suffer injury to its reputation if forced to switch to V-grooves.

■ PGA argues that Karsten's irreparable harm is due solely to Karsten's delay in complying with the rule change. Moreover, Karsten unjustifiably delayed bringing this action. PGA cites *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir.1984), and *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir.1985). In *Lydo*, the plaintiff had five years in which to comply with an ordinance; however, the plaintiff waited to file suit until ten days prior to the compliance deadline. *Lydo*, 745 F.2d at 1213–14. The court stated, "delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief. . . . We would be loath to withhold relief solely on that ground, but we do give that fact consideration in measuring the claim of urgency." *Id.* In *Oakland Tribune*, the agreements that the plaintiffs complained of had been in effect for "a number of years." 762 F.2d at 1377.

This case does not present a delay of several years. Here, the district court specifically found that Karsten and the professional player plaintiffs had pursued this action with reasonable diligence. Karsten sought a meeting with the PGA in June of 1989, four months after the PGA approved the rule change. Karsten met with the PGA one month later. John Solheim testified that he requested and received the test data PGA relied upon. He further testified that it took a couple of months to review the data. The district court's conclusion that Karsten brought this suit with reasonable diligence is not clearly erroneous.

## B. Harm to the PGA

Contrasted with these harms, the district court found that the PGA's potential damage is based on its claim that the injunction will damage its reputation as a sports governing body. The district court concluded that the balance of harms tips sharply towards Karsten and the professional player plaintiffs.

The PGA asserts that it will be damaged due to its inability to promulgate rules which bind its members. PGA cites *Heldman v. United States Lawn Tennis Ass'n*, 354 F.Supp. 1241, 1252 (S.D.N.Y.1973) for the proposition that the failure of the district court fully to evaluate the ban of the U-groove under the rule of reason before granting an injunction will unduly damage the prestige and operation of the PGA. The harm to PGA's prestige and operation may be substantial. *See STP Corp. v. United States Auto Club, Inc.*, 286 F.Supp. 146, 150 (S.D.Ind.1968). Nonetheless, Karsten and the professional player plaintiffs have demonstrated severe financial and reputational injury; by contrast the PGA has demonstrated injury only to its reputation. On this record, we cannot say that the district court abused its discretion in determining that the balance of hardships tips sharply in favor of the Karsten and the professional player plaintiffs. The next consideration is whether the district court abused its discretion in determining that serious questions exist which should be resolved in a hearing on the merits.

## II. Serious Questions

We need not decide whether the rule of reason or *per se* analysis will govern the plaintiff's antitrust claims. We hold instead that the district court did not abuse its discretion in determining that there are serious questions indicating a fair chance of success on the merits with regard to the circumstances surrounding the PGA Board's vote to approve the U-groove ban.

### A. Fiduciary Duty and By–Law Analysis

The district court held that there were substantial questions raised about the propriety of the manner in which the board passed the U-groove ban. The individual professional player plaintiffs have alleged that the PGA directors breached their fiduciary duties by breaching the by-laws, directly and indirectly, and by voting on an issue in which they had conflicting financial interests.

To the extent that the individual plaintiffs are members of the PGA organization, the individual plaintiffs argue that the members of the board of directors owe them a fiduciary duty. *See Levin v. Levin*, 43 Md.App. 380, 390, 405 A.2d 770, 777 (1979) (board of directors member owes the corporation a fiduciary duty). The professional player plaintiffs argue that the player directors and the officer directors have a duty to act "in the best interests of the corporation and [they are] prohibited from using [their] position ... for [their] private gain." *Id.* The PGA argues that Maryland law allows interested directors to act after full disclosure to the board and approval by the non-interested directors. *See* Md.Corps. & Ass'ns Ann.Code § 2–419. However, that statute only states that a contract or transaction is not void or voidable solely on the basis that an interested director voted on it. That section does not address whether there is a violation of the director's fiduciary duties when the interested director votes. The district court did not misapprehend Maryland law in the present case. *See Caribbean Marine Servs. Co.*, 844 F.2d at 673 (preliminary injunction will be reversed if the district court misapprehends the substantive law in assessing the merits).

The district court held that the first vote of the PGA Policy Board violated the by-laws of the PGA. The by-laws required the player directors to vote on rule changes. However, the district court found that none of the player directors voted to adopt the U-groove ban in violation of those by-laws because each of the player directors had a financial conflict. This conflict was due to ties to competing manufacturers of golf clubs. Subsequently, each of the directors voted to change the by-laws to allow the noninterested directors to vote, in the very same meeting and possibly with the intention of allowing the other directors to pass the regulation. Voting on a matter on which a director has a conflict of interest may violate that director's fiduciary duty. A court "may intervene to prevent (or annul) conduct on the part of directors that is fraudulent or represents a breach of their fiduciary obli-

gations." *Mountain Manor Realty, Inc. v. Buccheri,* 55 Md.App. 185, 194, 461 A.2d 45, 51 (1983).

We are not prepared to rule on the merits of these questions at this stage of the litigation and on this undeveloped record. We hold only that the district court did not abuse its discretion in determining that this case raises serious questions that must be resolved at trial.

## CONCLUSION

The preliminary injunction is necessary to preserve the *status quo ante litem* pending a hearing and a decision on the merits. *Oakland Tribune,* 762 F.2d at 1377. The district court did not err in determining that there are serious questions that should be resolved at trial and that the balance of hardships tips sharply in favor of the plaintiffs. Therefore, the district court did not abuse its discretion in granting the preliminary injunction. The judgment of the district court is

AFFIRMED.