NCR CORPORATION, Plaintiff,

v.

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY,
Defendant.

Harold MENOWITZ, et al., Plaintiffs,

v.

NCR CORPORATION, et al.,
Defendants.

Nos. C–3–91–78, C–3–91–12.

United States District Court,
S.D. Ohio, W.D.

March 19, 1991.

Armistead W. Gilliam, Greg Danilow, for NCR Corp.

Thomas B. Ridgley, James A. Wilson, William O. Fifield, Michael W. Schwartz, for AT & T.

Richard S. Wayne, Steve Schulman, Robert Harwood, for Menowitz plaintiffs.

FINDINGS OF FACT AND CONCLUSIONS OF LAW; OPINION; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF ON PLAINTIFF'S COMPLAINT AND IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF AND COUNTER–DEFENDANTS ON DEFENDANT'S COUNTERCLAIM IN CASE NO. C–3–91–78; JUDGMENT TO BE ENTERED IN FAVOR OF PLAINTIFFS AND AGAINST DEFENDANTS ON COUNT VIII OF PLAINTIFFS' SECOND AMENDED COMPLAINT IN CASE NO. C–3–91–12; EMPLOYEE STOCK OWNERSHIP PLAN INVALIDATED AND VOTING OF SHARES CREATED THEREUNDER ENJOINED; FINDING IN ACCORDANCE WITH FED.R.CIV.P. 54(b) IN CASE NO. C–3–91–12; TERMINATION ENTRY IN CASE NO. C–3–91–78; TERMINATION ENTRY WITH RESPECT TO COUNT VIII OF PLAINTIFFS' SECOND AMENDED COMPLAINT IN CASE NO. C–3–91–12

RICE, District Judge.

Case No. C–3–91–78 is a declaratory judgment action by Plaintiff NCR Corporation (NCR) seeking a declaration that its recently-established Employee Stock Ownership Plan (ESOP) is valid and enforceable. Defendant American Telephone and Telegraph Company (AT & T) has filed a Counterclaim, asking the Court to declare

that NCR's ESOP is invalid and unenforceable. AT & T further requests that the Court enjoin the ESOP shares from voting at the upcoming special meeting and regular annual meeting.

Case No. C–3–91–12 is an action by certain NCR Shareholders against NCR and its Board of Directors. Count VIII of the Amended Complaint alleges that NCR Corporation's ESOP is invalid, and Plaintiffs seek an injunction rescinding same. Plaintiff Shareholders also raise numerous other claims against NCR, as referenced in the other counts of the Amended Complaint.

The captioned two cases were consolidated for purposes of an evidentiary hearing upon the merits of Case No. C–3–91–78 and upon Count VIII of Case No. C–3–91–12 (the ESOP issue).

Following an expedited discovery period, a trial on the question of whether NCR Corporation's ESOP is valid and enforceable (or the converse) was held on March 11 and 12, 1991. Based upon the testimony and evidence presented at that trial, upon testimony and evidence presented through the parties' deposition designations and upon the arguments of counsel, the court hereby makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

A. *The Parties*

1. American Telephone and Telegraph Company, Defendant and Counter–Plaintiff in Case No. C–3–91–78, is a New York corporation with its principal place of business located at 550 Madison Avenue, New York, New York. AT & T provides domestic and international telecommunications services and manufactures telecommunications switching equipment, transmissions systems, cable and wire products, integrated circuits, other electronic components and general purpose computers, related peripheral devices and software.

2. NCR Corporation, Plaintiff and Counter–Defendant in Case No. C–3–91–78 and Defendant in Case No. C–3–91–12, is a Maryland Corporation with its principal place of business located at 1700 South Patterson Boulevard, Dayton, Ohio. NCR, a leader in the computer field, develops, manufactures, markets, installs and services business information processing systems for worldwide markets.

3. Charles E. Exley, Jr., Counter–Defendant in Case No. C–3–91–78 and Defendant in Case No. C–3–91–12, is Chief Executive Officer and Chairman of the Board of Directors of NCR.

4. Gilbert F. Williamson, Counter–Defendant in Case No. C–3–91–78 and Defendant in Case No. C–3–91–12, is President and a Director of NCR.

5. R. Elton White, Counter–Defendant in Case No. C–3–91–78 and Defendant in Case No. C–3–91–12, is Executive Vice–President and a Director of NCR.

6. William G. Bowen, Charles A. Corry, C. Howard Hardesty, Jr., Harry Holiday, Jr., John J. Horan, Cathleen S. Morawetz, Harold A. Poling, Frank P. Popoff, David R. Whitwam and John F. Woodhouse, Counter–Defendants in Case No. C–3–91–78 and Defendants in Case No. C–3–91–12, are Directors of NCR. These "outside" Directors have achieved outstanding success in the fields of business, science, law and education, and have careers wholly independent of and unrelated to their service as NCR Directors.

7. Harold Menowitz, *et al.*, Plaintiffs in Case No. C–3–91–12, are holders of shares of NCR common stock.

B. *NCR Corporation's Initial ESOP Study*

8. NCR first began considering the implementation of an ESOP in 1986, when the idea was mentioned as one of several possible defenses which could be raised in case of a hostile takeover attempt.

9. At that time, NCR contemplated an ESOP of approximately 250,000 shares. The idea was abandoned because an ESOP of that size was viewed as not being large enough to have a significant impact as a takeover defense.

10. NCR again began to discuss the feasibility of an ESOP as a takeover defense in 1988. Following NCR's July, 1988, Fi-

nance Committee meeting, a "steering committee" was appointed to evaluate the desirability of establishing an ESOP in preparation for a potential takeover offer.

11. The study of a potential ESOP carried over into 1989. The steering committee found that an ESOP was a possibly attractive anti-takeover measure. During that time period, Exley was of the opinion that an ESOP would be of at least "some benefit" should a takeover be attempted.

12. The idea of an ESOP generally met with a favorable reception from the Board. However, a number of "technical" difficulties persuaded the Board that an ESOP was not appropriate at that time. Among the problems encountered were the provisions of the Employee Retirement Income Security Act (ERISA) [1], which made it impossible for NCR to establish an ESOP while remaining faithful to a guarantee of minimum retirement benefits previously made to employees hired prior to May, 1985.

13. NCR's studies further revealed that an ESOP would result in fewer investment alternatives being available to employees, an undesirable consequence in light of the fact that employee choice was a hallmark of the company's benefit package. The Board was also concerned that an ESOP would limit NCR's control over the funding of employee benefits.

14. During the entire period from 1986 to mid–1989, the ESOP concept was discussed primarily in the context of potential takeover defenses. In fact, top employee benefits personnel felt that current benefits were "satisfactory and competitive." Douglas M. Bartlett, Director of Employee Benefits, found "no compelling reason to change benefits."

15. After the Board determined that an ESOP was not feasible, in mid–1989, stud-

ies on the ESOP were discontinued and the topic was not raised again until after AT & T's tender offer.

C. *American Telephone and Telegraph Company's Tender Offer and Subsequent Proxy Contest*

16. Beginning in mid-November, 1990, AT & T made unsolicited proposals to NCR to purchase all of NCR's outstanding common stock in exchange for AT & T stock.

17. On December 5, 1990, the NCR Board of Directors announced that it had rejected AT & T's $90.00 per share stock-for-stock offer as inadequate. The Board endorsed Exley's strategy of offering to enter into negotiations with AT & T only if AT & T raised its offer at least $125.00 per share.

18. On December 6, 1990, AT & T commenced a tender offer for all outstanding shares of NCR stock at a price of $90.00 per share in cash. The NCR Board recommended that shareholders reject that offer.

19. NCR has a "staggered" Board, with one-third of the seats up for election at each regular annual meeting. Therefore, under normal circumstances, a proxy contestant, even with the support of a majority of shares, must wait two years to gain control of the Board.

20. A special meeting must be called upon a written request by the holders of at least 25 percent of a corporation's outstanding shares of stock. At a special meeting, an entire board of directors may be replaced at one time.[2]

21. Under the terms of NCR's Charter, a "supermajority" vote of 80 percent of all *outstanding* voting shares is required to replace a majority of Directors at a special meeting. Since it is necessary to obtain 80 percent of the outstanding shares, as opposed to 80 percent of the shares actually

---

**1.** Specifically, the Board found that ERISA's requirement that not more than ten percent of the assets of a pension plan be in the form of company assets made an ESOP unattractive.

**2.** At trial, it was established that all of NCR's Directors could potentially be removed following a vote at a special meeting. In their post-trial briefs, however, the parties indicate that a

majority of Directors can be replaced at a special meeting. While the statements are not necessarily inconsistent, there was no testimony presented which suggests that some, but not all, of the Board members could be unseated as a result of the shareholder vote at a special meeting.

voted, shares not voted at a special meeting are the functional equivalent of votes for the incumbent Board.

22. At each of the last four NCR shareholder meetings, the total voter turnout has been less than 80 percent.

23. On January 21, 1991, AT & T delivered to NCR written requests for a special meeting representing over 25 percent of NCR's outstanding voting stock. March 1, 1991, was set by NCR as the record date for both the special meeting and the regular annual meeting. The date of both the special meeting and the annual meeting was announced as March 28, 1991.[3]

24. As of January 15, 1991, holders of approximately 70 percent of NCR's outstanding common stock had tendered their shares to AT & T. These shares had been tendered even before AT & T had begun to solicit individual and retail holders. Subsequent telephone solicitations of individual and retail holders had been surprisingly positive.

25. Although it would be difficult for AT & T to prevail at the special meeting in its attempt to replace all or a majority of the NCR Directors, the 80 percent figure, absent the ESOP, is not unattainable.

D. *Adoption of the NCR ESOP*

26. NCR began reconsidering the concept of establishing an ESOP in December, 1990. Once again, the ESOP was discussed in the context of a takeover defense, not as an employee benefits option. In fact, Dr. Bowen testified that, following AT & T's tender offer, *all* NCR matters were discussed in light of the takeover attempt.

27. At the regular monthly meeting on December 13, 1990, Dillon, Read & Company, NCR's financial advisor, advised the Board that it should consider an ESOP as a potential defense to AT & T's takeover attempt. Goldman, Sachs & Company, NCR's other financial advisor, later rendered a similar opinion.

28. Bartlett, on the other hand, felt that NCR's compensation package remained satisfactory and competitive, and that, from a benefits perspective, an ESOP was unnecessary.

29. NCR management began to restudy the ESOP alternative, and advice was solicited from both legal and financial advisors.

30. The usual practice at NCR regarding changes in benefits plans had been for the changes to be considered and analyzed over a period of time. Proposals would be generated either by the Employee Benefits Department or by the Human Resources Department.

31. In this case, however, NCR's *financial* officers took the lead in structuring the ESOP. Benefits personnel had very little input.

32. Although Exley knew that the resulting plan would be "very complicated," the Board was committed to implementing the ESOP in time for shares to be distributed to employees prior to the record date in order to allow the employees to vote on matters vital to their and the company's future.

33. In instituting an ESOP, NCR remained confronted by the same impediments which had caused it to abandon the idea in 1989. In particular, the guarantee made to pre–1985 employees was a continuing concern.

34. A presentation was made to the Board at the regular meeting on January 16, 1991, by John Giering, NCR's Chief Financial Officer. Giering briefly outlined what an ESOP was, discussed the Company's prior consideration of an ESOP and outlined the terms of the ESOP then under consideration. Exley told the Board that a

---

3. The Maryland corporate law regarding the calling of special meetings has not been put into evidence, and no party has asked the Court to take judicial notice of same. Similarly, no evidence was presented, either at trial or through deposition testimony, of the reasons for AT & T's desire to replace all or a majority of NCR Directors. Since the validity of the special meeting has not been challenged, and since, as discussed *infra*, the actions of a board of directors are entitled to a presumption of validity, the Court will assume that it has been called in accordance with Maryland law. The Court will further infer, for purposes of this decision, that AT & T desires to replace the Board in order to facilitate its takeover attempt.

specific plan would be presented at the February meeting.

35. Apparently, between the initial decision in December to restudy the ESOP idea and the January meeting, a solution had been found to the problems which had previously proved insurmountable. Specifically, the ESOP was structured around a "notional account" which would satisfy ERISA while maintaining the guarantee in slightly modified form. However, testimony at trial showed, and the Court so finds, that the notional account was not an innovation or an intellectual breakthrough.

36. During this time period, James McElwain, NCR's Vice–President for Personnel and Education, expressed misgivings about the ESOP. In particular, he felt that it would be "hard to sell" to employees, and that many of them would view it as a negative.

37. McElwain also felt that the ESOP which was beginning to take shape was not the type of plan which would be proposed under "normal" circumstances, where "the primary criteria are benefits related."

38. Between the January and February Board meetings, Board members were sent various materials relating to the ESOP, and most Board members met individually with management representatives and their financial and legal advisors.· The materials sent to the outside Directors during this period were, in all major respects, the same materials which were presented at the February 20, 1991, Board meeting.

39. At the February 20, 1991, Board meeting, Giering made a detailed presentation of the proposed ESOP. In conjunction with this presentation, the Directors were given "Board books," which basically reflected the materials sent to them over the previous month.

40. The Board books do not contain a great deal of substantive information regarding the specifics of the proposed ESOP. Rather, most pages simply contain a number of "bullets," evidently signifying general areas of interest or topics of conversation. There are a number of graphs comparing the proposed plan with the current benefits package, and various charts showing the general economic impact of the ESOP on the company. Some general articles on ESOPs are reproduced, but there is no comparison of the proposed ESOP to working models at other companies. Following Giering's presentation, the Board voted unanimously to adopt the proposal.

41. No benefits personnel made a presentation at either the January or February Board meetings. Board members were not informed of McElwain's reservations about the ESOP. Although McElwain was present at the February meeting, no questions were directed toward him.

42. At both the January and February meetings, the usefulness of the ESOP as a reaction to AT & T's takeover attempt was discussed.

43. In the period between mid–1989, when the ESOP idea was tabled by the Board, and the adoption of the ESOP in 1991, changes in tax laws and accounting rules had caused ESOPs to become less attractive financing options.[4] As a result, investment bankers experienced a dramatic downturn in the number of ESOPs being established by major corporations.

44. The Board was apparently unaware or only vaguely aware of these developments.

E. *The NCR ESOP's Size and Voting Impact*

45. On February 20, 1991, nine days before the record date of March 1, NCR authorized the issue of 5,509,641.873 shares of preferred stock to State Street Bank and Trust Company as ESOP Trustee at a price of $90.75 per share, for an aggregate price of $500 million.

---

**4.** During most of the years 1988 and 1989, companies sponsoring ESOPs were able to borrow money at below-market interest rates. This tax incentive was effectively repealed about November, 1989. While the tax advantage still technically exists, the amendments to the Internal Revenue Code make it virtually impossible for publicly traded companies, including NCR, to qualify.

46. The NCR preferred stock initially is convertible into eight-tenths of a share of common stock at a conversion price of $113.4375 per share of common stock. This price represents a conversion premium of 25 percent over the closing of NCR common stock the day before the transaction was submitted to the Board for approval.

47. Under the terms of the preferred stock, the approximately 5,500,000 newly issued shares are entitled to one vote per share even though each preferred share is convertible into only eight-tenths of a share of common stock. This preferential treatment of the voting power of the NCR convertible preferred stock vis-a-vis the common shares is referred to by the NCR Board as "heavy voting."

48. The ESOP provides for an initial allocation of one share of preferred stock for each of the approximately 24,000 salaried employees who are eligible to participate in the ESOP. This step was taken in advance of the March 1 record date for the upcoming special meeting, notwithstanding that the period in which employees are entitled to elect whether to participate in the ESOP did not begin until March 4, three days after the record date.

49. None of the employees asked to have the stock issued to them, and none of them paid for the shares. NCR made no attempt to determine how many employees would actually be interested in enrolling, despite the fact that the benefits people were not confident that it would be well-received.

50. McElwain stated at an executive committee meeting on January 19, 1991, that the proposed ESOP could perhaps be "sold" to only "50–60%" of NCR's employees. NCR management did not share McElwain's misgivings with the Board, and there was apparently no discussion at the Board meetings regarding the likely reaction of employees to the plan.

51. There had been little or no change in the competitiveness of NCR's benefits package between 1989, when an ESOP was rejected, and December, 1990, when the AT & T offer prompted NCR's reconsideration.

Over the relevant time period, the level of NCR's benefits had remained unchanged from a competitive viewpoint. This fact was highlighted by a study conducted by Hewitt & Associates, NCR's benefits consultants, which showed NCR's level of retirement benefits as above the average of NCR's peers.

52. Through the ESOP, NCR has vested voting power over the entire 5,500,000 share block of NCR preferred stock, including approximately 5,476,000 shares that have not yet been allocated to anyone, in approximately 24,000 employees who have been given one share each. The Trustee is obligated by the "pass-through" or "mirrored" voting provisions of the ESOP to vote the entire block of unallocated shares in the same proportion as those employee shares voting at any NCR shareholders meeting.

53. Since the power to vote the 5,500,-000 preferred shares is divided among the holders of 24,000 shares, the pass-through voting procedure vests each of the shares held by NCR's current employees with the equivalent of 229 votes.

54. Since the ESOP in question is a leveraged ESOP, all shares were issued at once. The 5,500,000 share block puts about eight percent of the outstanding NCR voting stock into employee hands. At the same time, this large issue dilutes outstanding common stock shares by approximately six percent.

55. If NCR had employed an unleveraged ESOP, a smaller number of shares would have been issued initially, and future shares would be issued incrementally. As a result, the dilutive effect of the stock issue would be alleviated. Although Goldman, Sachs suggested that such an approach was possible, NCR never considered that option.

56. The 5,500,000 share issue is over twenty times as large as the ESOP originally considered in 1986 and 1989. Moreover, it commits a large number of shares to the Trustee and employees regardless of future benefits needs. An unleveraged ESOP, with incremental issues, would have

allowed NCR to issue shares in accordance with its actual benefits needs.

57. James Ahstrom, an ESOP specialist with First Boston Corporation, testified, and the Court so finds, that unleveraged ESOPs enjoy substantial tax advantages not available to leveraged ESOPs. Specifically, a corporation which has an unleveraged ESOP may deduct depreciation. If NCR's stock rises in the manner predicted by NCR's financial advisors, NCR will have foregone potentially hundreds of millions of dollars in tax savings by leveraging its ESOP.

58. Testimony also established that the same objectives of providing incentive to employees by vesting them with partial ownership and by tying their compensation to the growth of the company may be achieved with equal success through an unleveraged ESOP.

59. In electing to participate in the ESOP, employees must opt out of a profit-sharing plan which had previously been available to them. There is no evidence from which it may be inferred either that the Board was of the opinion that an ESOP would provide greater incentive than the profit-sharing plan, or that the ESOP would, in fact, have such an effect.

60. The size of the ESOP[5] was not related to benefits objectives but, rather, was an attempt to place as large a number of shares into friendly hands as possible.

61. NCR could have lessened the dilutive effect of the ESOP by initiating a stock repurchase, but declined to do so. Although Exley testified that he anticipates NCR repurchasing stock in the future, Ahstrom's testimony established that a future repurchase would not alleviate the short-term dilutive effects of the preferred stock issue.

62. Goldman, Sachs informed NCR that it could later alleviate the dilution by refinancing the ESOP through an outside loan and using those funds to repurchase shares of common stock. It is not clear that this advice was relayed to the Board. Moreover, while the Board discussed the dilutive effects of the ESOP in general terms, there were no decisions, or even proposals, made regarding whether a stock repurchase should be considered. Finally, since certain "irreducible minimum" language, discussed *infra*, is missing from certain legal opinions, NCR could experience difficulty in refinancing the ESOP in the future, should it attempt to do so.

### F. *NCR Employees' One–Time Irrevocable Decision*

63. Under the terms of the plan, NCR employees have a two week period, beginning March 4, 1991, to make a one-time irrevocable decision whether to enroll in the ESOP. This is in sharp contrast to the old benefits plan, which allowed employees to defer benefits elections until retirement.

64. Despite the fact that employees have a short period in which to make an important decision on a highly complicated subject, the basic informational booklet explaining the ESOP program, which was to be sent to employees on February 21, was not sent to the first group of employees until February 28—one business day before the start of the election period.

65. Similarly, the computer software necessary to assist NCR employees in making their one-time election, which was to be available on February 22, was not available as of March 6, after the enrollment period had already begun.

### G. *The Issuance of the Preferred Stock*

66. The only consideration NCR received for the issuance of 5,500,000 shares of convertible preferred stock to the ESOP Trustee was the Trustee's $500 million nonrecourse promissory note due in 2016.

67. None of the provisions of the ESOP impose any obligation upon NCR employees to provide funds to be used to pay for

---

**5.** Exley testified that the Board's prior consideration of an ESOP had been based on a hypothetical plan of about 250,000 shares, which was rejected, in part, because it was not large enough to have a significant impact as a takeover defense. The ESOP actually adopted is over twenty times that size.

all or any portion of the 5,500,000 preferred shares.

68. The contract documents by which the ESOP was implemented require NCR to provide the Trustee with sufficient funds to permit the Trustee to turn around and pay NCR the amounts of principal and interest due from time to time upon the note. In effect, NCR agreed to pay itself principal and interest upon the $500 million note, using the Trustee as a conduit for such payments, throughout the 25–year life of the ESOP.

69. An ESOP transaction in which the issuer receives only the trustee's non-recourse promissory note in exchange for the issuance of stock differs in substance from the conventional leveraged ESOP financed by a bank loan guaranteed by the issuer. In the case of bank financing, cash flows into the corporation that can be used to generate additional earnings. In contrast, in a case where the corporation simply issues stock in exchange for a promissory note, the existing shareholders' interest is diluted without any enrichment of the corporation.

70. The customary practice when a new series of securities is issued is for the purchaser or receiver to demand a legal opinion stating the securities are validly issued. In Maryland, such legal opinions customarily contain language indicating that the securities are "validly issued, full paid,[6] and nonassessable."

71. The Trustee's outside legal counsel requested both Charles Russ, NCR's general counsel, and NCR's Maryland counsel, Piper & Marbury, to render such an opinion. Although both offered legal opinions, neither opinion contained the words "validly issued, full paid, and nonassessable."

72. The legal opinions were obtained after negotiations. While it is not uncommon for parties to negotiate over the language of legal opinions, Lowell Bowen, an expert

on Maryland corporate law, described the terms "validly issued, full paid, and nonassessable" as being "irreducible minimums." Since that language is missing, it is possible that NCR would experience difficulty in refinancing the ESOP in the future, should it attempt to do so.

73. The customary practice of Maryland lawyers rendering opinions on the validity of the issuance of stock is to render an opinion in substantially the form of the draft which State Street requested from Piper & Marbury, and which that firm declined to give. The opinion letter that Piper & Marbury actually gave NCR and the Trustee deviated in form from the normal and accepted practices of Maryland lawyers.

74. Maryland law is not entirely clear on whether a promissory note constitutes valid consideration for an issue of securities. A Bill introduced in the Maryland House of Delegates in 1990, if adopted, would have the effect of specifically including promissory notes among the authorized forms of consideration for issues of stock and other securities. The explanation provided by the bar association committee which drafted the proposed amendment states that valid consideration for issues of securities is currently "limited to the payment of money, the delivery of tangible or intangible property or the performance of past service to the corporation," i.e., forms of consideration which would exclude promissory notes.[7]

75. The stock certificates representing shares of NCR Series C ESOP Convertible Preferred Stock issued to the Trustee contain no legend indicating that payment has been received by the issuer and, therefore, are not in the customary form.

76. The outside Directors on the NCR Board were apparently not aware that the Trustee and NCR had "bargained away" the customary language, thus subjecting

---

**6.** The usual term in other jurisdictions is "fully paid," but "full paid" is the standard expression in Maryland.

**7.** Since a determination of whether the preferred stock was, in fact, validly issued under Maryland law is unnecessary to the disposition

of this case, that question will not be resolved at this time. However, were resolution of this issue to become mandatory, the Court's conclusion might well be adverse to NCR, based upon, inter alia, the brief commentary set forth above.

the issuance of the stock to some degree of legal uncertainty.

77. Despite the fact that NCR's financial advisors suggested future refinancing as a means of reducing the dilution caused by the ESOP, and the fact that Exley indicated that he felt a stock repurchase was not unlikely, management never informed the Board of potential problems with Maryland law which jeopardized NCR's ability to obtain refinancing of the ESOP.

### H. *Economic Incentives for Preferred Shareholders to Vote for NCR*

78. The holders of NCR preferred stock are the beneficiaries of a unique "reset" provision. Under this provision, if the price of NCR common stock drops (for example, should AT & T withdraw its tender offer), the conversion formula for the ESOP preferred stock will be "reset" in order to compensate for the lower common stock value. The preferred shares, currently convertible into eight-tenths of a share of common stock, will actually become convertible into more than one share of common stock. No such "downside" protection is available to holders of NCR common stock.

79. Reset provisions are extremely rare in ESOPs. In several respects, the reset provision in the NCR ESOP is unprecedented. First, preferred shareholders are protected against a price drop of up to about 75 percent; other resets typically protect the shareholder only up to 10 or 15 percent. Second, the NCR reset is available for fourteen months. The next longest reset period that Ahstrom had ever heard of was six months.

80. While the Board was certainly aware of the reset provision, it is not clear that NCR management informed the Board of its unique nature.

81. If AT & T withdraws its tender offer, the price of NCR stock is expected to fall as much as twenty or thirty points. If that occurs, the preferred shares will be reset, diluting the common stock even further.

82. The holders of NCR preferred stock have no downside risk. Preferred shareholders have downside protection at all times because of a perpetual "floor" at the $90.75 purchase price that is built into the terms of the preferred. At any time during the life of the plan when a share of preferred stock can be redeemed, the holder of the preferred stock may elect to receive either (i) the fair market value of the shares of common stock into which the preferred stock is convertible, plus any dividends which have accrued over the years, *or* (ii) the issue price of $90.75 per share. Thus, while common holders are subject to full market risk, an ESOP participant is guaranteed a minimum payment of $90.75 per preferred share, regardless of however low the price of NCR common stock may drop.

83. If, after falling, the stock price ultimately rises again, common shareholders will have suffered an interim loss in value. In contrast, under such circumstances, preferred shareholders will actually have obtained a benefit from the interim downturn in market price because of the operation of the reset provision. Therefore, preferred shareholders have an economic incentive to vote against AT & T's nominees at the special meeting.

84. Even though the common belief of NCR management is that the withdrawal of the tender offer will cause an immediate drop in the price of NCR's stock, the Board did not discuss that possibility, and the consequences of the subsequent reset of preferred stock.

85. If the AT & T offer succeeds, each employee who chooses to participate in the ESOP will lose the future profit potential on preferred shares in the plan. While each of the 24,000 employees who received one share of preferred stock may receive as much as $1,800 in his or her retirement account (available only upon retirement), this amount appears *de minimis* compared to NCR's projection of the future returns to an employee who elects to participate in the ESOP. Therefore, any employee aware of NCR's optimistic stock price projections would have strong incentive to vote against AT & T at the special meeting.

86. Employees who give up a pre–1985 guarantee in order to enroll in the ESOP will have even more interest in voting against AT & T since an AT & T takeover would leave those employees with neither the guarantee (which he or she must give up in order to enroll in the ESOP) nor the preferred shares.

87. Even if AT & T were to raise its tender offer price, the 25 percent "redemption premium" built into the preferred stock operates so that the holders of the preferred will gain no value; the preferred stock is indifferent to increases in prices below $123.08 per share. By contrast, if AT & T were to raise its price, the common stock will, in turn, benefit dollar for dollar. Therefore, should AT & T raise its tender offer above $90.00 per share, but less than $123.08 per share, holders of preferred shares and holders of common shares may find themselves with conflicting interests.

88. In short, the economic incentives built into the terms of the preferred shares would cause most rational preferred shareholders who understood the terms and provisions of those shares to vote for the incumbent NCR Directors and against AT & T at the special meeting.

## I. *The ESOP's Effect on the Outcome of the Special Meeting*

89. Ahstrom testified that he believed most preferred shareholders would vote in favor of NCR at the special meeting. This opinion is consistent with the report of Georgeson & Company, NCR's proxy solicitor, who predicted that 90 percent of the preferred shares would be voted in favor of NCR. AT & T's proxy solicitor, Morrow and Company, also believes most preferred shares would be voted in favor of NCR. Accordingly, the Court concludes that a large percentage of the 5,500,000 shares of preferred stock would, if voted, be cast in favor of the incumbent Board.

90. The full Board never received Georgeson's report regarding its prediction of share voting with and without the ESOP, and the information contained in that report was apparently not conveyed to the Board, although they were made aware of Georgeson's ultimate conclusion, *i.e.*, that Georgeson felt that the ESOP shares would vote heavily in favor of NCR. The Board was also informed of Georgeson's conclusion that the final outcome of the vote would not be significantly altered by the ESOP.

91. There is no evidence in the record concerning the methodology used by Georgeson in projecting the NCR stockholder vote, and the bases and assumptions upon which the report relied were apparently not explained either to NCR management or to the Board.

92. The Georgeson tables dated January 23, 1991, received in evidence were prepared only one week after AT & T submitted shareholder requests for the special meeting, and well before the meeting had been scheduled. The tables were also completed before AT & T had access to NCR's stockholder list and before certain lists of brokers and beneficial owners were even prepared and made available to either NCR or AT & T.

93. The Georgeson report was completed before either side's proxy solicitor was able to canvass NCR shareholders other than institutional investors and arbitragers, and certainly before AT & T had the benefit of communicating its platform to all stockholders. In fact, the Georgeson study may have been based upon the assumption that AT & T would never have access to complete lists of NCR's stockholders.

94. The fact that 70 percent of all NCR shares were tendered in the first month of AT & T's tender offer demonstrates strong support for AT & T among institutional investors and arbitragers. Although some of the shares originally tendered (perhaps about five percent) have since been withdrawn, such a withdrawal is common and not indicative of a withdrawal of support for the offer. Often when a tender offer is extended, as AT & T's offer has been, institutional investors withdraw tendered shares in order to lend the securities, thus earning a greater return on the securities, until the final tender deadline approaches. Therefore, the withdrawal of tendered

shares alone does not reflect diminished support for AT & T in the proxy contest.

95. Recent developments have provided AT & T's proxy solicitor with important new information. The stockholder list materials that AT & T obtained as a result of litigation in the Southern District of New York have enabled Morrow to contact and survey two additional groups of investors, individual shareholders and beneficial owners of stock held in the name of brokerage firms.

96. Individual stockholders, generally characterized by long term investments and loyalty to a company, tend to support incumbent management. Here, however, two factors mitigate the normal effect of the individual investor group voting heavily in favor of the incumbents. First, the group of individual stockholders is quite small, holding only 13 percent of all NCR common stock. Second, Morrow's canvassing has revealed that among the shares held by individual investors, 45 to 50 percent are supportive of AT & T's proxy campaign.

97. The shareholder lists also reveal that 11 percent of NCR's stock is beneficially owned by retail customers and held of record by brokerage firms. These retail customers characteristically look for short-term profits and would thus be likely to support AT & T's tender offer. Morrow's professional analysis establishes that approximately 80 percent of this group are likely to vote at the special meeting, and that about three-quarters of those who vote will do so in favor of AT & T.

98. Many NCR shareholders, particularly the institutional investors and arbitragers, will recognize that with the ESOP in place AT & T will likely not win the required 80 percent vote at the special meeting. At least some of these professional investors are thus likely to choose to sell their NCR stock in the open market. Those sellers, who as holders on the March 1 record date retain the right to vote those shares at the special meeting, will have no interest in the proxy contest and many, if not all, will forego voting. Some percentage of those holders who do not sell their

shares may nonetheless fail to vote as a result of the perception that AT & T cannot obtain the 80 percent vote.

99. The conclusions presented at trial by Morrow were fully supported by a detailed explanation of the analysis from which those conclusions were derived. The Georgeson report, on the other hand, was presented as merely a set of bald conclusions. The bases and assumptions upon which Georgeson's conclusions are based are not evident from the report itself, and Exley was unable to shed light on those questions. Accordingly, the Court finds Morrow's report more credible and probative than that of Georgeson.

100. NCR management was fully aware that the ESOP would potentially hurt AT & T's chances at the upcoming special meeting. An early draft of NCR's proposed press release to use with the announcement of an ESOP stated:

> According to NCR Chairman and CEO Charles E. Exley, Jr., "The new plan will create a 'win-win' situation for NCR people and the company. It will result in wider employee ownership of the company, and therefore a greater share in the results of NCR's new product programs, which promise to revolutionize the information industry in the 1990s. *Another obvious effect of the plan will be to dilute AT & T's efforts to acquire NCR and allow the company to continue to work toward achieving its vision."*

101. Drafts of Exley's proposed announcement of the ESOP to NCR's employees were prepared well in advance of the February 20 Board meeting. A "Draft # 3" of Exley's proposed speech stated that "[t]he NCR ESOP in the short-term surely will help us remain independent," and proceeded to emphasize the impact that NCR felt the proposed ESOP would have on the shareholders' vote:

> Just how powerful will the employee ESOP be in influencing decisions that pertain to the company? All 24,000 eligible employees will receive one share of NCR convertible preferred stock in an initial allocation. To provide for this initial allocation and the on-going company

match to your savings, the ESOP trust will be funded in excess of 5 million shares. The trustee will vote all shares in the same proportion as you vote your shares. NCR people will be shareholders of record prior to March 1, the date set by the company to qualify for voting at NCR's Annual Meeting and the special meeting of shareholders requested by AT & T.

102. Regardless of the predictions of the proxy solicitors, the ESOP has the effect of placing a substantial block of stock into "friendly" hands. Although Exley referred to ESOPs as "feeble" defenses, NCR needs only garner 20 percent of the vote at the special meeting [8] to avoid replacement of its Directors. Since the Board and management hold approximately two percent of the outstanding shares, and the ESOP accounts for approximately eight percent, roughly half of the votes necessary to forestall AT & T's attempt to control the Board appear to be a "lock" for NCR.

103. Accordingly, the Court concludes that the 80 percent target, which is realistically attainable for AT & T absent the ESOP, is, for all practical purposes, an unreachable goal if preferred shares created by the ESOP are allowed to vote.

## J. Information Not Presented to or Discussed by the Board

104. When a new series of stock is issued, it is customary for a corporation to obtain a "fairness opinion," stating, in essence, that the issue is fair to current shareholders.

105. No fairness opinion was sought or received in connection with the issue of the convertible preferred stock. Although at least some Board members are familiar with the concept of a fairness opinion, the desirability of obtaining one was never even discussed.[9]

106. The Board was not informed that NCR's senior benefits professionals would not recommend the plan if the "primary criteria were benefits related."

107. The dividend on the preferred stock is about two percentage points higher than that on common shares, a situation which Ahstrom characterized as a "transfer of wealth" from common holders to holders of preferred stock. While this fact may have been known to Board members, its fairness in respect to the common shareholders was apparently not a subject of discussion.

108. According to Ahstrom's expert analysis, and the Court so finds, the ESOP will always be dilutive of the common stock; under no set of circumstances will common holders realize an accretion. It is unclear that the Board was aware of this fact.

109. The Board was told that one of the assumptions upon which the ESOP was based was that NCR stock would grow at an average rate of 11 percent per year throughout the 25–year life of the plan. Board members were not shown the annual breakdown prepared by Goldman, Sachs, which estimated that the stock would realize huge growth in the next few years and experience negative growth during the final years of the plan, thus resulting in a final average of 11 percent.

110. If the 11 percent per year average stock price growth which was presented to the Board had been the product of an estimated "straight-line" 11 percent annual increase, the cost to the company would be about $65 million less (on a present-valued basis) than the actual expected cost based upon Goldman, Sachs' predictions. Since the Board was not given the year-by-year breakdown which Goldman, Sachs had pre-

---

**8.** In fact, for NCR to prevail at the special meeting, it is not necessary that 20 percent of the votes be cast affirmatively in its favor. Since AT & T must obtain 80 percent of all outstanding shares, it is enough, from NCR's perspective, that at least 20 percent of the shares not vote in AT & T's favor. All abstentions, therefore, favor NCR.

**9.** Although Goldman, Sachs has a policy of not rendering fairness opinions, NCR offered no explanation as to why a fairness opinion was not requested from Dillon, Read, NCR's other financial advisor, or from an outside firm.

pared, they were consequently unaware of the actual projected cost.

111. Although the Board was told in the Board book that the ESOP shares "are considered outstanding" if issued in exchange for the Trustee's note, the Directors were not told that, at the very least, there was a substantial legal doubt that this was true under Maryland law, and that neither NCR's Maryland counsel nor NCR's general counsel was willing to give the customary legal opinion certifying that the shares were validly issued.

112. The Directors were similarly not informed by management that the stock certificates were not in the customary form in that they lacked the legend indicating that payment has been made.

113. Unaware of potential problems with Maryland law, the Board could not have known that the possibility of the ESOP later being refinanced through a bank loan had been jeopardized by the absence of customary opinions that lending institutions generally require.

114. For the same reason, the Directors could not have known that a proper listing application could not be made to the New York Stock Exchange for the common shares into which the ESOP preferred is convertible. No such application was made, in apparent violation of the Stock Purchase Agreement and the Exchange's Listed Company Manual, and there is no evidence that the Board was ever so informed.

115. The Board was not advised that the tax and accounting benefits that had made ESOPs more attractive financing devices until the end of 1989 had been repealed.

116. The Board was not advised that the terms of the ESOP preferred were extremely unusual, and that no other ESOP preferred has the combination of terms contained in the NCR ESOP. A Duff & Phelps summary of some 60 ESOPs, although contained in Goldman, Sachs' files, was neither given to the Directors nor summarized for them.

117. The Board was presented only with a leveraged ESOP proposal, not an unleveraged one as well. The Board was either unaware of or simply did consider the fact that the same employee benefits and incentives could be conferred and created through an unleveraged ESOP in which (i) the company would retain hundreds of millions of dollars of potential tax deductions which a leveraged ESOP sacrifices; (ii) the company could keep control over share allocations on an annual basis instead of attempting to estimate benefits needs 25 years into the future; and (iii) there would accordingly be no risk of overfunding.

118. While it appears that it is not unheard of for a company to "seed" a newly-established ESOP by distributing free shares, NCR's seeding is extreme. First, shares were distributed to all eligible employees, not merely to those who expressed an interest in participating in the ESOP. Second, the seeding had the effect of providing each eligible employee with the equivalent of 229 votes at the special meeting. The Board either did not know or was not concerned that the seeding procedure contained in the plan was unprecedented.

119. The ESOP actually adopted was considered at only a single Directors' meeting, that of February 20. As late as the preceding meeting, January 16, it was still not decided whether the ESOP would be funded with common or preferred stock, and no proposed plan was presented at that meeting.

120. The press release issued after the Directors' meeting, and presumably authorized there, reflects substantial confusion on the Directors' part as to the ESOP they had just adopted. The press release states that, with adoption of its ESOP, NCR "joins a list" of seven other major U.S. companies with ESOPs. However, the ESOPs of those other companies are materially different than that adopted by the NCR Board, and none of those other ESOPs was adopted in the face of an ongoing tender offer and a shareholder-requested special meeting.

121. The Directors did not adequately consider the extent to which the ESOP

would interfere with AT & T's proxy contest. Although at least some of the Board members felt that the ESOP would not alter the outcome of the election, this was apparently based solely or primarily upon Exley's oral account to the Board of Georgeson's view that AT & T stood no chance of winning in any event.

122. In light of the fact that the adoption of an ESOP in the face of a tender offer is an extraordinary occurrence (although perhaps not unprecedented), and given the fact that 70 percent of the outstanding shares had already been tendered, the apparent lack of concern by the Board for the ESOP's potential to impede corporate democracy is somewhat remarkable. This is even more surprising in light of the fact that the preferred stock contained economic incentives which the Board should have realized would create a conflict of interest between holders of preferred and common stock.

123. Although Exley testified that he "anticipates" instituting a stock repurchase sometime in the future in order to offset the dilutive effects of the ESOP, and this idea was communicated to the Board, the Board did not discuss the feasibility or desirability of a repurchase in concrete terms. The Board did not come away from the meeting with any kind of mutual understanding regarding the likelihood of a future repurchase.

K. *Irreparable Injury*

124. If the ESOP preferred shares are permitted to vote at the special meeting, NCR common stockholders will be denied a meaningful opportunity to replace incumbent NCR Directors with new Directors nominated by AT & T. With the ESOP in place, AT & T cannot possibly achieve the necessary "supermajority" vote.

125. If the ESOP preferred shares are permitted to vote at the special meeting, a number of shareholders will be discouraged from retaining their shares and from exercising their right to vote at the special meeting based on an assumption that AT & T cannot win. Although this number is not readily quantifiable, any amount of lost votes is significant to AT & T in light of the supermajority provision in NCR's Charter.

126. If the ESOP preferred shares are permitted to vote at the special meeting, NCR common stockholders may be deprived of the opportunity to decide for themselves whether to accept the AT & T tender offer, and AT & T may be deprived of the unique business opportunity to acquire NCR, with the result that the price of the NCR stock will experience a drop in value, possibly as low as $63–72 per share.

127. If the ESOP shares vote and, consequently, AT & T is unsuccessful in its attempt to unseat the entire slate of incumbent Directors at the special meeting, AT & T is not necessarily precluded from pursuing other avenues in its quest to gain control over NCR. AT & T will, however, have forever lost a realistic and probably unique opportunity to attain its goal through a favorable 80 percent vote at the special meeting. The fact that AT & T will have some speculative chance to gain control of NCR at some indeterminate point in the future does not serve to make AT & T's loss here less than irreparable.

128. Unless injunctive relief is granted, the harm to AT & T and to NCR's common shareholders will be irreparable.

## OPINION

A. *Applicable Law and Burdens of Proof*

NCR is a Maryland corporation. The parties have proceeded on the assumption that, since the obligations of corporate directors are dictated by state law, the law of Maryland is applicable to this case. This proposition is sound. *See Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979).

As an initial matter, the question of the parties' respective burdens of proof must be addressed. In both Case No. C–3–91–12 and Case No. C–3–91–78, NCR relies on the "business judgment rule," both as a justification for its action in its Complaint, and as a defense to AT & T's Counterclaim

and to the Shareholder Plaintiffs' Complaint. In Maryland, it is well-settled that "[i]n all cases, the business judgment rule creates the presumption that directors act in good faith." *Zimmerman v. Bell,* 800 F.2d 386, 392 (4th Cir.1986). *See also Devereux v. Berger,* 264 Md. 20, 284 A.2d 605, 612 (1971). This presumption is "heightened" where, as here, the majority of the Board members are independent outside directors. *Zimmerman,* 800 F.2d at 392; *Martin Marietta Corp. v. Bendix Corp.,* 549 F.Supp. 623, 634 (D.Md.1982).

What is somewhat less clear is the effect of this presumption upon the parties' respective burdens. If this case were governed by the Federal Rules of Evidence, the problem would be resolved by reference to Rule 301, which states:

> In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

In this case, however, the law of Maryland controls. Rule 302 dictates that

> In civil actions and proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law.

The parties, while generally agreeing that NCR enjoys a presumption in this case, do not suggest how the existence of this presumption affects their burdens. The Court's own research reveals only that the law of Maryland is not entirely clear on this subject. *See, e.g., Ristaino v. Flannery,* 317 Md. 452, 564 A.2d 790 (1989).

Fortunately, the question may be successfully resolved without peril of casting too onerous a burden upon any party. In this case, NCR has filed a Complaint seeking a declaration that its ESOP is valid and enforceable. AT & T's Counterclaim alleges that the ESOP is invalid and unenforceable. The logical solution would be to impose the burden of proof on each party as to their respective requested declarations. In other words, NCR has the burden of proof on its Complaint, and AT & T carries the burden of proof on its Counterclaim.[10]

■ Finding no clear statement to the contrary by any Maryland tribunal, the Court will assume that the presumption imposed by the business judgment rule works in a manner similar to Fed.R.Evid. 301: it creates a presumption, without need for any evidentiary showing, that NCR's Board acted in good faith. This presumption, should AT & T fail to offer rebuttal evidence, would be sufficient to mandate a decision in favor of NCR. Once AT & T presents evidence adequate to rebut the presumption of business judgment, the burden of production shifts back to NCR to set forth evidence supporting its contention that its Directors *in fact* acted in good faith and in the best interests of the company. However, the ultimate burden of persuasion remains at all times upon NCR on its Complaint and upon AT & T on its Counterclaim.

The same analysis applies with equal force to Case No. C–3–91–12. In that case, Plaintiff Shareholders also seek to prevent NCR from implementing the ESOP. Since NCR enjoys a presumption that its ESOP was established in good faith, the *Menowitz* Plaintiffs are faced with the burden of production in that they must rebut the defense of business judgment. If they are successful in this endeavor, the burden of production will revert to NCR to set forth evidence indicating that its Directors are protected by the business judgment rule. The burden of persuasion remains, however, with the *Menowitz* Plaintiffs.

**B. *NCR's Business Judgment Justification (NCR's Complaint)***

■ "In Maryland, as elsewhere, directors of a corporation occupy a fiduciary

---

**10.** Thus, even if the Court has erred in placing the burden of proof on NCR for purposes of its Complaint, NCR will suffer no prejudice thereby since AT & T carries the burden of proof on its Counterclaim, which is a mirror image of the Complaint.

relationship to the corporation and its stockholders." *Martin Marietta,* 549 F.Supp. at 633. As noted above, there is a presumption, under Maryland law, that a corporate board of directors acts in the best interests of the corporation. In order to rebut a business judgment claim, the party challenging the validity of a board's actions must produce evidence sufficient to rebut this presumption that the directors acted in accordance with their fiduciary duties.

The heart of the fiduciary duty imposed upon directors of publicly-held corporations is the obligation to "act in a manner they reasonably believe to be in the best interests of the corporation." *Martin Marietta,* 549 F.Supp. at 633. This duty is plainly composed of two separate elements, one subjective and the other objective. A director may take no action on behalf of a corporation unless he or she is of the belief that such action is in the corporation's best interest. However, the second condition implicit in the director's fiduciary duty is that his or her belief be reasonable.

Applying the first prong of this test to the facts of the case at bar, the Court has difficulty in believing that NCR's outside Directors adopted the ESOP with the subjective belief that they were acting in a manner harmful to the corporation or its common shareholders. NCR's ten outside Director's are both accomplished and respected in their various fields, are independent of NCR's management, and would appear to have little to gain by acting improperly.

The testimony of Director Bowen indicates that he, and presumably other members of the Board, were acting on the assumption that AT & T would be unsuccessful in its attempt to replace the entire Board at the special meeting regardless of whether the ESOP was adopted. If Bowen is taken at his word, and if the other Board members indeed shared that belief, then it would appear that the Board cannot be accused of having acted in bad faith.

This, however, does not automatically entitle NCR to judgment in this case. As the court noted in *Martin Marietta,* a board's

belief that it acts properly must be reasonable. The business judgment rule serves to uphold the decisions of a board which acts *"on an informed basis,* in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984) (emphasis added). *See also Smith v. Van Gorkom,* 488 A.2d 858 (Del. 1985).

■ Any decision undertaken on the basis of insufficient knowledge is inherently unreasonable. "Under the business judgment rule there is no protection for directors who have made 'an unintelligent or unadvised judgment.' " *Smith,* 488 A.2d at 872, *quoting Mitchell v. Highland–Western Glass,* 167 A. 831, 833 (Del.Ch. 1933). The *Smith* court further pointed out:

> A director's duty to inform himself in preparation for a decision derives from the fiduciary capacity in which he serves the corporation and its stockholders. Since a director is vested with the responsibility for the management of the affairs of the corporation, he must execute that duty with the recognition that he acts on behalf of others. Such obligation does not tolerate faithlessness or self-dealing. But fulfillment of the fiduciary function requires more than the mere absence of bad faith or fraud. Representation of the financial interests of others imposes on a director an affirmative duty to protect those interests and to proceed with a critical eye in assessing information of the type and under the circumstances present here.

*Smith,* 488 A.2d at 872. *See also* Annotation, *Duty of Corporate Directors to Exercise "Informed" Judgment in Recommending Responses to Merger or Tender Offers,* 46 A.L.R.4th 887 (1986) and cases cited therein.

■ In the present case, the record is rife with references to information which was readily available but which was either not presented to the outside Directors by management or, if it was presented, was apparently not duly considered by the Board. While there is no one topic or

subject which, if not fully discussed and evaluated by a board of directors, will cause a transaction to become *per se* invalid, the totality of the circumstances in this case indicates that the NCR Board, in approving management's ESOP plan, acted manifestly without an adequate body of knowledge.

### 1. *Fairness Opinion*

It is customary for corporations to seek a fairness opinion from an investment banker or other financial expert prior to issuing a new series of securities. The purpose of obtaining an objective, independent evaluation of the proposed issue is to ensure that the issuance of the new stock or other security will be fair to existing shareholders. However, despite the fact that NCR management was aware that the proposed ESOP was dilutive of common stock, no fairness opinion was sought. This is even more remarkable given the apparent advantages that the preferred shares enjoy over common stock, such as heavy voting, the reset provision and the higher dividend rate.

The Board members are sophisticated business persons who have some familiarity with the concept of fairness opinions. Yet there was no discussion at any of the Board meetings regarding the lack of such an opinion. Management did not offer an explanation for the absence of one, and no outside Director asked.

### 2. *Opinion of Benefits Professionals*

Exley knew in January, 1991, if not earlier, that NCR's top benefits people were not impressed with the ESOP concept. Bartlett thought that NCR's current compensation package was competitive and adequate. McElwain was not confident that the personnel department could sell the employees on the concept of an ESOP, nor was he of the opinion that the proposed ESOP was a plan which would make sense "under normal circumstances." None of this was relayed to the Board.

The ESOP was adopted without a study or survey directed at gauging employee support for the plan. Despite the fact that a huge number of preferred shares were being committed to the ESOP, management did not offer the information that the potential enrollment was not known, and that it might be as low as 50 or 60 percent of eligible employees.

Once again, the Board's failure to direct questions to management is puzzling. No member asked why no presentation was forthcoming from the employee benefits or human resources departments. Despite the fact that McElwain, the senior benefits professional, attended the February meeting, he was not asked for his professional opinion of the ESOP.

### 3. *Tax and Accounting Changes*

In the years 1988 and 1989, the investment banking industry realized a huge upturn in the ESOP business. By 1990, the number of companies seeking to implement ESOPs had dropped dramatically. The expert testimony at trial established that the downturn in ESOPs was due in large part to changes in tax laws and accounting rules which made ESOPs a much less attractive financing alternative. In structuring its ESOP, NCR employed the aid of two of the most prominent investment banking firms in the country. Yet it was discovered at trial that the Board members were, at best, only vaguely familiar with these significant developments.

### 4. *Maryland Law*

There were numerous problems with the issue of the preferred stock under Maryland law. It is questionable whether the promissory note received from State Street constitutes valid consideration in Maryland. The Board, however, was told that the ESOP shares were "considered outstanding" if issued in exchange for the Trustee's note. Management neglected to tell the Board that neither Piper & Marbury nor NCR's General Counsel (who was present at the Board meetings) had issued the type of opinion letter customarily rendered under Maryland practice.

The Board was never made aware that the certificates of stock issued to the Trustee did not bear the legend customarily

printed on outstanding stock under Maryland practice signifying that payment had been received for the shares. The Board was further unaware that, since the opinion letter and the stock certificates were not in the customary form, a listing application could not be made to the New York Stock Exchange for the common shares into which the preferred is convertible. Perhaps most significantly, the Board had no knowledge that the ability of NCR to refinance the ESOP is subject to doubt since the company "bargained away" the "irreducible minimum" language in the opinion letter.

### 5. *Future Stock Repurchase*

Investment banking professionals at Goldman, Sachs indicated to NCR management that a stock repurchase was advisable in the future to help alleviate some of the dilutive effects of the ESOP stock issue. It is far from clear that Goldman, Sachs' advice ever reached the ears of the Board.

Exley testified at trial that he mentioned the possibility of a future stock repurchase to the Board, and evidence presented established that NCR has repurchased stock in the past. Both Bowen and Exley testified that the Board was concerned about the amount of dilution that would be caused by the preferred stock issue. It seems remarkable, therefore, that no Board member demanded more information from Exley regarding a stock repurchase, and that no discussion seems to have taken place. At a minimum, one would expect that the Board would have tried to reach at least a tentative decision on whether a repurchase was desirable or feasible, the possible number of shares to be repurchased and/or the approximate price at which a repurchase should be commenced.

### 6. *Future Stock Growth*

█ The Board was presented with Goldman, Sachs' prediction that the value of NCR stock would climb at an average rate of 11 percent annually over the 25–year life of the ESOP. Management did not, however, inform the Board that the analysis was not based on an assumption of "straight-line" growth. Rather, NCR's financial advisors projected stock price increases for the next three years of 40 percent, 28 percent and 23 percent respectively. Toward the end of the 25–year period, conversely, the stock price is expected to decline.

Bowen testified that the Board was mainly concerned with the average numbers. However, given only a raw figure of 11 per year, it is impossible to accurately estimate the cost of the ESOP to the company. The difference between a straight-line growth of 11 percent per year and the growth actually projected by Goldman, Sachs is approximately $65 million. In other words, if a Board member assumed that each year NCR stock prices would rise about 11 percent, he or she would have underestimated the ESOP's cost to the company by $65 million. Since it is not clear what assumptions the Directors made regarding the 11 percent figure, NCR has not demonstrated that they actually knew the true cost of the ESOP.

### 7. *Unleveraged ESOP Not Considered*

NCR management was aware, based on consultations with their financial advisors, that an unleveraged ESOP was an available option. It was also made clear to them that there were certain advantages inherent in an unleveraged ESOP. First, a smaller number of shares could be issued initially. After that, the number of shares issued annually could be adjusted to meet the company's actual benefits needs. This option should have been particularly attractive in light of the fact that NCR had no idea how many employees might actually enroll in the plan.

In addition to eliminating the risk of overfunding, an unleveraged ESOP would have allowed NCR to avail itself of tax deductions for depreciation, a savings of potentially hundreds of millions of dollars over the life of the ESOP. However, Exley stated that an unleveraged ESOP was never considered. The proposal made to the Board did not mention the unleveraged option, and the outside Directors were never

presented with a meaningful comparison of the two types of ESOPs.

### 8. *The Unique Nature of the ESOP*

The NCR ESOP has a number of unusual features which distinguish it from other ESOPs. These features include the reset provision, the "seeding" procedure, the mirrored voting, the heavy voting and the redemption premium. The preferred stock carries a higher dividend yield and is protected by a price "floor." Finally, the plan was adopted in the face of a tender offer.

None of these factors, in and of itself, would necessarily raise red flags as to the legality of the ESOP. Resets, while rare, are not unheard of in ESOPs. This reset, however, had extraordinary provisions allowing protection for a longer period and against steeper price drops than any reset provision which Ahstrom had ever seen. Seeding is not unprecedented, but no evidence was presented to the effect that other companies had ever distributed free shares of stock to all eligible employees, or that the shares distributed through the seeding process had the benefit of mirrored voting.

Heavy voting is similarly not unprecedented, nor is it inherently wrong for one series of stock to have a higher dividend rate than another. There was no evidence that price floors are uncommon. While Ahstrom testified that he had never heard of an ESOP being implemented in the face of a tender offer, the existence of some case law on the subject suggests that the NCR action is not a first.

The features of the preferred stock are troubling only when viewed in the aggregate. In a press release, NCR claimed that it was "joining a list" of seven other prominent corporations which have ESOPs. Yet it was demonstrated at trial that NCR's ESOP is not remotely like the plans established by those companies. While various other ESOPs may contain one or two of the features included in NCR's plan, proof was offered that the combination of less than ordinary features in the NCR preferred make it absolutely unprecedented.

The Board, however, was of the opinion that it was adopting an ESOP much like those already in place at other companies. Although a comparison chart of approximately 60 ESOPs of other companies was available, the Board was not told of its existence. In sum, although the Board certainly knew what particular features were included in the plan which it approved, it is far from clear that they fully understood the true nature of their creation.

### 9. *Corporate Democracy*

According to a report generated by Georgeson & Company, NCR's proxy solicitors, the ESOP should not materially affect the outcome of the vote at the special meeting. This report was distributed only to NCR management, and Georgeson never explained the bases and assumptions upon which its calculations were based. At trial, Exley was unable to explain how Georgeson reached its conclusions.[11]

Despite the fact that the soundness of the Georgeson report was an open question, the outside Directors were told that the ESOP was not necessary as a defensive measure since AT & T couldn't get 80 percent of the vote at the special meeting anyway. The Georgeson report, however, was not presented to the Board members, and the Directors apparently did not question the basis for management's conclusion that AT & T would not win the vote.

As Directors, the NCR Board has a fiduciary duty to the shareholders. While that duty does not necessarily mandate that the Board follow every directive of the majority of shareholders, it surely includes some obligation to at least ensure that principals

---

**11.** Morrow, AT & T's proxy solicitor, opined that AT & T had a realistic chance of achieving victory at the special meeting if the ESOP shares did not vote, but was "dead in the water" if the preferred shares did vote. As explained above in the Court's Findings of Fact, a representative of Morrow & Company provided a detailed ba-

sis for its conclusions at trial. Since Morrow's analysis is reasonable, and since Georgeson's conclusions are unexplained and, therefore, suspect, the Court attaches far greater weight to the Morrow report and, accordingly, adopts its conclusions as the Court's findings on this issue.

of corporate democracy are not unduly submerged in an attempt by management to entrench itself. Yet the Board uncritically accepted the bald assertion that the ESOP would not affect the vote without pausing to question the source of that conclusion. In light of the fact that 70 percent of NCR's shareholders tendered shares even before AT & T had been able to solicit proxies from individual and retail holders, there should have been at least some informed debate by the Directors regarding their duty to their shareholders.

### 10. *Conclusion*

■ Based on the foregoing analysis, the Court concludes that the NCR Board did not act in bad faith in adopting the ESOP. However, the transaction is not protected by the business judgment rule because the Board was not acting in an informed capacity. This seems to be the fault both of NCR's management, which failed to make the Board aware of key information, and of the Board itself, which failed to ask questions, consider certain consequences or examine the plan with a critical eye.

Accordingly, NCR has not met its burden of proof on its Complaint of proving that its ESOP is valid and enforceable.

### C. *Invalidity of the ESOP Under the Primary Purpose Test (AT & T's Counterclaim and the Menowitz Plaintiffs' Complaint)*

In the seminal case of *Cummings v. United Artists Theatre Circuit, Inc.,* 237 Md. 1, 204 A.2d 795, 806 (1964), the Maryland Court of Appeals [12] declared that

> where a good corporate purpose is being furthered and is the principal motivation for an action by a board of directors, the fact that the consummation of such transaction may have some effect on the control of the corporation is immaterial and the agreement will stand or fall depending on whether it is fair to the corporation.

The import of the *Cummings* holding was later expounded upon by the court in *Mountain Manor Realty, Inc. v. Buccheri,* 55 Md.App. 185, 461 A.2d 45 (1983):

> Whatever the law may be elsewhere, it seems fairly clear that in Maryland stock issuances which have the effect of consolidating or perpetuating management control are not necessarily invalid. They are, instead, to be examined under a sort of balancing test; assuming that the transaction is legal in all other respects [13] ... the court must look to see if there was any legitimate business purpose for the transaction other than the self-interest of the directors. If it finds such a purpose, under *Cummings* it would then have to determine whether that independent purpose was a primary or principal one, or whether, conversely, the primary object was merely to manipulate control.

461 A.2d at 53. The court concluded:

> If the court finds that the transaction was, on the whole, motivated by a legitimate corporate purpose, it should declare the sale [of stock] to be valid; if it finds to the contrary—that the purpose of the transaction was primarily one of management's self-perpetuation and that that purpose outweighed any other legitimate business purpose—it should declare the sale to be invalid.

*Id.* Armed with this clear statement of Maryland corporate law, analysis of the present case becomes a fairly straightforward exercise.

■ Under the above referenced test, the Court must make an initial determination of whether the NCR ESOP has "the effect of consolidating or perpetuating management control." *Mountain Manor,* 461 A.2d at 53. There is little doubt that it does.

While the Georgeson report indicates that the ESOP will have a minimal effect on the vote at the special meeting, AT &

---

**12.** The Court of Appeals is the high court of Maryland.

**13.** As discussed previously, it is far from clear that the issuance of the ESOP preferred stock was valid in all other respects under Maryland law. However, for purposes of this analysis, it will be assumed that the shares were legally issued by NCR.

496

T's proxy solicitor, Morrow and Company, strongly disagrees. However, both solicitors concur in the proposition that the vast majority of NCR employees will vote with management. The disagreement arises over how common shareholders, particularly institutional holders, will react to the ESOP. Therefore, it may be concluded that while the ESOP ensures NCR of a substantial number of favorable votes, the question of how many votes the ESOP will cost NCR is considerably more speculative.

Moreover, the Court cannot agree with Exley's evaluation of the defense afforded by the ESOP as "feeble." The ESOP places eight percent of the outstanding shares into friendly hands. While eight percent may not be large number in overall terms, it represents 40 percent of the 20 percent vote of all outstanding shares which NCR must obtain in order to thwart AT & T's attempt to replace NCR's Board of Directors.

Finally, NCR does not dispute the fact that employees will vote overwhelmingly in favor of management. Votes of disinterested shareholders are much less certain. Therefore, despite protestations to the contrary, NCR basically concedes that the ESOP will serve to consolidate management control *to some degree.* Accordingly, the Court finds that the ESOP does, indeed, have the effect or consolidating or perpetuating management control.

The next determination is whether the ESOP serves any legitimate corporate purpose. Quite apart from their perceived utility as a defense to hostile takeover attempts, ESOPs are a common form of employee compensation. They serve the purpose of giving salaried employees a stake in the company's future, thereby presumably providing those employees with added incentive to put forth their best efforts. Robert Allen, AT & T's Chief Executive Officer, stated in his deposition that he believes "that ownership in any company has characteristics of incentive or has the potential of providing incentive to employees."

■ The evidence presented at trial demonstrates that the NCR Board shares a similar belief. The Board feels that NCR is in a position to expand rapidly, and that tying employee interests more strongly to the growth of the company will help NCR realize its potential. The Court cannot quarrel with the logic of that proposition. Accordingly, the Court finds that the ESOP was motivated, at least in part, by a legitimate corporate purpose.

Since the ESOP has the effect of perpetuating management control, but also serves a valid purpose, the Court must embark upon the balancing test referred to in *Mountain Manor.* Upon weighing the facts, the evidence, taken as a whole, overwhelmingly demonstrates that the primary purpose of the ESOP is to entrench NCR management, in contravention of the principals of corporate democracy. The Court bases this determination upon a series of factors, none of which, standing alone, is dispositive, but which, in the aggregate, allow for no other conclusion.

1. *Timing*

■ The timing of the ESOP is, in and of itself, enough to raise an inference that it was motivated by a desire to perpetuate management control. The ESOP concept, which had been abandoned over a year earlier as unfeasible, was suddenly resurrected in the face of AT & T's tender offer, and in spite of intervening tax law and accounting rule changes which made the concept far less attractive as a means of benefitting employees. The steering committee, despite months of study from 1988 to 1989, was unable to come up with a workable ESOP model. The same problems were resolved in a matter of weeks in late 1990 and early 1991. Yet the notional account, the vehicle by which these hurdles were overcome, was not considered innovative in 1990.

The ESOP, despite its complexity, was put together in a surprisingly short amount of time. NCR candidly admitted at trial that the Directors were determined to issue the preferred stock before the record date to ensure that the 5,500,000 shares could be voted by employees at the special meeting. In so doing, NCR left its personnel

department in the unenviable position of having only a matter of weeks to explain a highly complicated plan to 24,000 employees in sufficient detail to allow them to make a one-time irrevocable decision.

In its haste to get all the pieces in place by the record date, the finance department outraced the employee benefits department, resulting in the enrollment period opening before informational booklets and software had been made available to workers. In addition, NCR was willing to settle for a legal opinion regarding the validity of the stock issue under Maryland which calls into question its ability to refinance the ESOP at a later date.[14]

### 2. *Size*

The enormous size of the initial stock issue also reveals its true purpose. Despite the fact that NCR had no firm indication of what employee response would be to the ESOP, over five and a half million shares were issued for 24,000 current salaried employees. NCR sacrificed thousands, if not millions, of dollars in future tax benefits and left itself without the ability to adjust the plan to meet actual benefits needs. All this was done for the sole purpose of creating a sizable voting block of shares in time for a meeting crucial to the continued survival of the company as an independent entity.

NCR's own benefits people are of the opinion that the size of the ESOP is not benefits related. Moreover, the vast majority of the shares are not allocated to employees. Unallocated shares of stock are not likely to provide much of an incentive to employees to work harder. The same objectives of giving salaried employees a stake in NCR's future could have been just as effectively and much less expensively achieved through a smaller ESOP, either leveraged or unleveraged.

### 3. *Mirrored Voting*

Closely related to the size of the ESOP is the fact that the ESOP has a mirrored voting provision which allows each employee to, in effect, cast 229 votes at the election. However, from a compensation standpoint, the same employee who votes 229 shares receives a benefit based only upon his one allocated share.

If the primary purpose of the ESOP is to provide employees with better benefits, there is no need for the mirrored voting procedure. The only financial benefit employees receive from the plan is based upon the number of shares actually allocated to him or her. The huge block of unallocated shares provides no compensation to any employee at the present time. While employees who choose to enroll in the ESOP will presumably have more shares allocated to their accounts in the future, there is no evidence that any employee is likely to accumulate in the neighborhood of 229 shares.

If the primary purpose of the ESOP is to provide incentive to employees to put forth their best efforts on behalf of the company, the mirrored voting is similarly meaningless. Since, as just discussed, an employee receives an actual financial benefit only from his or her allocated shares, workers do not benefit from an unallocated block of shares held by the Trustee. Finally, neither of these alleged motives explains why employees who have no interest in participating in the ESOP, thus receiving neither compensation nor incentive from the plan, are allowed to cast 229 votes at the special meeting.

### 4. *Context of ESOP Discussions*

Director Bowen stated at trial that all discussions that the Board undertook in late 1990 and early 1991 took place in the context of the AT & T tender offer, an understandable state of affairs. Both he and Exley admitted that the ESOP idea resurfaced as one of a range of possible defenses to the takeover attempt.

However, that is only part of the story. Even though there was no apparent threat of a takeover attempt in 1986 or in 1988–89, NCR's interest in ESOPs during those

---

**14.** As noted above, refinancing was suggested by NCR's financial advisors as a means of funding a stock repurchase for the purpose of offsetting the ESOP's dilutive effects.

time periods was similarly limited to their use as a defensive measure. At no time was an ESOP ever proposed as a means of employee compensation or as a tool to provide greater incentive to workers, even during the years 1988 and 1989, when the favorable tax and accounting treatment of ESOPs motivated numerous other companies to establish them.

### 5. Lack of Personnel or Employee Benefits Department Input or Support

The testimony establishes that employee benefit changes usually had their genesis in either the personnel or the employee benefits departments. However, the finance committee took the lead in investigating and structuring the ESOP. The employee benefits people did not have a great deal of input when it came to putting together the final proposal. Indeed, the Board showed surprisingly little interest in the opinion of the benefits department. Although McElwain, the ranking employee benefits person at NCR, was present at the February, 1991, Board meeting, he did not give a presentation, nor did the Board direct questions to him.

The evidence also demonstrates that the benefits department was not in favor of the ESOP. Bartlett felt that the current compensation package was competitive with comparable companies. McElwain thought that the plan would be difficult to communicate, and that it might not be well-received by the employees. Neither felt that the ESOP, as designed, was either a necessary or a practical compensation device.

### 6. Structure of the Preferred Stock

Finally, the economic incentives built into the preferred stock cannot be ignored. These incentives pit the interests of preferred shareholders against those of common shareholders. Moreover, the preferred stock is structured in a manner which virtually assures that no rational holder, fully apprised of the terms and conditions of the preferred stock, will vote against the incumbent Board at the special meeting.

Both Exley and Bowen testified that the Board's position was that employees should have greater protection than other shareholders. The typical stock investor is looking for profit, and is willing to take a risk in the hopes of realizing either a long-term or a short-term gain. However, since an employee's stock holdings representative some fraction of his or her retirement security, a great deal of risk is inappropriate.

This argument is irrefutable. The problem is that the preferred stock goes much further than merely offering shareholders additional protection. As discussed above, there are actual incentives for a preferred shareholder to oppose the tender offer. The most striking is the reset provision, which provides a strong economic benefit to preferred holders if NCR stock prices experience a short-term drop, as is expected if the AT & T offer is withdrawn.

NCR points to *Zimmerman v. Bell*, 800 F.2d 386 (4th Cir.1986) for the proposition that a board of directors may, under Maryland law, refute an "entrenchment" claim by demonstrating that it acted to "save the company from a seriously undervalued tender offer that threatened [its] unique contribution" to the industry. 800 F.2d at 392.

Assuming, *arguendo*, that this is a correct interpretation of Maryland law, NCR's reliance on *Zimmerman* is unavailing. NCR has demonstrated neither that AT & T's tender offer is seriously undervalued nor that NCR's contribution to the computer industry is unique. The Court does not find to the contrary; rather, NCR failed to present evidence, at trial or through deposition testimony, from which the Court may reasonably conclude that AT & T's tender offer was grossly inadequate. In fact, there is very little before the Court from which it may even be inferred that the Board *deemed* AT & T's tender offer to be undervalued, let alone that the Board's belief was reasonable.

The Court's determination that the NCR Board acted with the primary purpose of "rigging" the vote at the special meeting is sufficient to invalidate the transaction un-

der the applicable law of Maryland. However, the parties have also thoroughly briefed this case under the law of Delaware. While Maryland law is dispositive, the Court recognizes that the decisions of Delaware courts are often persuasive in the field of corporate law. On the chance that Maryland would follow pertinent Delaware case law, the Court emphasizes that the same result is mandated by that body of authority.

The courts of Delaware recognize that "the business judgment rule is available to directors acting in response to a takeover threat." *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 278, 286 (Del.Ch. 1989) (*Polaroid II*).

> However, because of the "omnipresent specter that a board may be acting primarily in its own interests," two requirements must be satisfied before the business judgment rule will be applied. The directors must establish "reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership" and the defensive measure chosen by the board must be "reasonable in relation to the threat posed."

559 A.2d at 286–87 (*citing Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954–55 (Del.1985).

As previously discussed, NCR presented little or no evidence regarding the Board's reaction to AT & T's offer, other than the unsupported conclusion that the offer was deemed inadequate and the fact that it was rejected. Accordingly, the Board has emphatically *not* demonstrated that it reasonably believed that AT & T's attempt to gain control of NCR constituted a danger to "corporate policy and effectiveness." Since the first predicate to the business judgment rule has not been established, it follows that second prong of the test has not been met. Not knowing what danger the Board perceived, it is impossible to judge whether its reaction "was reasonable in relation to the threat posed."

Parenthetically, the Court would add that, even had NCR established that the Board reasonably felt that a grossly inadequate tender offer from AT & T seriously threatened the company, it is unlikely that the ESOP was a rational response to that danger. First, as referenced above, the Board did not exercise informed judgment in its decision to adopt the ESOP. Moreover, the ESOP itself appears hastily thrown together and unfair to common shareholders, both to an extreme.

NCR put together an extremely complex ESOP in a matter of weeks. Given the fact that the Board had previously identified a number of serious obstacles to the establishment of an ESOP, it is unlikely that the proposed ESOP could have been thoroughly thought out in the short time period in which it was created. This is demonstrated by the fact that the common denominator of the evidence presented regarding the development, adoption and implementation of the plan seems to be haste.

No fairness opinion was sought. A legal opinion regarding the validity of the offer was quickly negotiated. The benefits people were not consulted to any significant degree. The stock issue was authorized nine days before the record date. Shares were distributed before the enrollment period began to employees who might not even choose to participate in the ESOP. The enrollment period commenced before informational booklets and software had been made available.

The Board either was not acting upon full information, or it failed to deliberate upon serious matters. There was a general unfamiliarity with the changes in tax laws and accounting rules. There was no conception of how the plan would be received by employees. The Georgeson report was not made available beyond the mere conclusions therein, nor were the suggestions and opinions of NCR's financial advisors faithfully relayed to the outside Directors. The views of McElwain and other benefits department representatives were not considered. In sum, the ESOP was not the result of careful planning.

In addition to presenting 24,000 employees with an immediate, irrevocable choice of benefit plans, the ESOP appears unfair to common shareholders. While other in-

vestors purchase stock at market price, each employee receives one free share of preferred stock. The preferred stock has the benefit of heavy voting, as well as a reset provision which negates the risk of market fluctuations. The preferred stock carries a higher dividend, and is dilutive of the common. Finally, it creates a potential conflict of interest between the two classes of stock.

The ESOP is similarly unfair to NCR itself. It is the corporation, not the beneficiaries of the stock issue, which foots the bill. Since the leveraging was internal, no new capital flows into the company. NCR is locked into a large ESOP which cannot be adjusted to meet actual needs. Significant tax advantages were lost by the decision to leverage the plan.

Finally, NCR contends that the decision in *Shamrock Holdings, Inc. v. Polaroid Corp.*, 559 A.2d 257 (Del.Ch.1989) (*Polaroid I*) supports its position. This argument need not long detain the Court.

In *Polaroid I*, the court held that where, as here, the board of directors fails to act in an informed capacity, "the business judgment rule will not be applied and the transaction at issue will be scrutinized to determine whether it is entirely fair." 559 A.2d at 271. In that case, Polaroid established an ESOP which the court determined to be "partly defensive." The nine million shares of stock allocated to the ESOP caused a dilution of about five percent.

The Polaroid ESOP had a mirrored voting provision which allowed the independent trustee to vote unallocated shares in proportion to shares actually voted, similar to the NCR plan. Through the use of mirrored voting, Polaroid employees gained the right to vote 14 percent of the company's stock. Since Delaware law requires an 85 percent "supermajority" vote to replace an entire slate of directors, the proxy contestant found itself with only a one percent margin for error. The court, however, found that, on the whole, the plan was fair.

The fatal flaw in NCR's argument, of course, is that, in addition to having all the above referenced characteristics present in the Polaroid plan, the NCR ESOP has additional features which make the Polaroid plan pale in comparison. First, while the Polaroid plan was found to be "partly" defensive, the NCR plan was adopted with the overwhelming purpose of thwarting AT & T's tender offer. Employee benefits were not a primary concern.

Second, Polaroid financed its ESOP with a $285 million bank loan, thus realizing an influx of capital. It further financed the project by immediately cutting employee salaries and reducing the pay scale. Polaroid employees, therefore, shouldered part of the financial burden. Here, the ESOP was internally leveraged, and NCR employees contribute nothing toward the cost of the plan. The preferred shares have a dividend two percent higher than common stock, representing a further transfer of wealth from common shareholders to preferred.

Under the terms of the Polaroid plan, all shares of stock would be allocated to employees within ten years. It is not clear if all NCR preferred shares will ever be distributed to employees. NCR preferred shares enjoy heavy voting and are protected from market fluctuations by a price "floor" and a reset provision, features absent in the Polaroid ESOP. Finally, despite the fact that NCR has no direct control over the votes cast by employees, the economic incentives inherent in the ESOP preferred stock assure NCR of employee loyalty at the ballot box. Accordingly, the Court cannot conclude that, even under the lenient standards of *Polaroid I*, the NCR ESOP may be characterized as fair.

■ Based upon the above, the Court concludes that AT & T has met its burden of proof on its Counterclaim of demonstrating that the primary purpose of the NCR ESOP was not benefits related but, rather, was an attempt by NCR management to impede corporate democracy and to perpetuate its control of the company. Accordingly, the ESOP is invalid and unenforceable. Since this burden is the same as that cast upon the *Menowitz* Plaintiffs in Count VIII of their Second Amended Complaint, it

follows that they, too, have met their burden.

### D. *Injunctive Relief*

 In order to be entitled to a permanent injunction, a party must demonstrate a continuing irreparable injury if the injunction does not issue, and the lack of an adequate remedy at law. *National Org. for Women v. Operation Rescue*, 726 F.Supp. 1483 (E.D.Va.1989), *aff'd*, 914 F.2d 582 (4th Cir.1990); *Dayton Christian Schools v. Ohio Civil Rights Comm'n*, 766 F.2d 932, 961 (6th Cir.1985), *rev'd on other grounds*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). The party seeking an injunction must prove the threat of irreparable injury by a preponderance of the evidence. *Corenco Corp. v. Schiavone & Sons, Inc.*, 362 F.Supp. 939, 944 (S.D.N.Y.), *modified on other grounds*, 488 F.2d 207 (2d Cir.1973).

As noted earlier, AT & T has demonstrated by a preponderance of the evidence that it has a realistic chance of prevailing at the special meeting if the ESOP preferred shares are not voted. AT & T has similarly shown, again by a preponderance of the evidence, that it cannot possibly prevail if the ESOP shares are voted.

Therefore, if the ESOP is not enjoined, AT & T will have been deprived of a unique opportunity to obtain control over the NCR Board of Directors. The Shareholder Plaintiffs will similarly be deprived, by NCR's invalid tampering with the corporate electoral system, from exercising their right to meaningful participation in the selection of corporate Directors.

NCR contends that this harm is not irreparable since AT & T is not prevented from pursuing its strategy by replacing four Directors at this year's regular annual meeting, and four more next year, thus attaining a majority of the Board. While NCR's argument makes sense in theory, it ignores the realities of the marketplace.[15] AT & T is currently in a position to present a serious challenge to NCR's incumbent Directors. A large percentage of shares

have been tendered, solicitations of individual and retail holders are proceeding more successfully than originally anticipated, and a great deal of support has been expressed for AT & T.

Due to the vagaries of the economy and other factors, it is impossible to predict how long AT & T can maintain its offensive against NCR. In the often fickle world of the stock market, opportunity seldom knocks twice. The fact that AT & T can still attempt to replace the Board over a period of time does not serve to make up for the loss of a realistic chance for immediate success.

 Accordingly, the issue is not whether the NCR ESOP totally and permanently precludes AT & T from ever making a successful bid for control of NCR, either through eventually replacing a majority of the Board of Directors or through a successful tender offer. Rather, the issuance of an injunction must turn upon the question of whether the existence of the ESOP prevents AT & T from having a fair chance of replacing a majority or all of the incumbent Directors at the March 28, 1991, special meeting, and upon the question of whether the ESOP prevents NCR shareholders from having a meaningful voice in the running of the company. Since the ESOP does, in fact, serve to make a mockery of the upcoming election, same is hereby invalidated and the voting of the preferred shares created thereunder enjoined.

### CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over NCR's Complaint for Declaratory Relief and AT & T's Counterclaim for Declaratory and Injunctive Relief, pursuant to 28 U.S.C. § 1332. The amount in controversy, exclusive of interest and costs, exceeds $50,000.

2. This Court has jurisdiction over the *Menowitz* Plaintiffs' Complaint for Injunctive and Declaratory Relief, pursuant to 28 U.S.C. § 1332. The amount in controversy,

---

**15.** Parenthetically, this argument fails to address the Shareholder Plaintiffs' continuing irreparable injury as a result of the denigrating effects on their right to corporate democracy.

exclusive of costs and interest, exceeds $50,000.

3. Venue is proper in the Southern District of Ohio, pursuant to 28 U.S.C. § 1391(a) and (c).

4. Since NCR is a Maryland corporation, the law of Maryland is applicable to this case.

5. NCR carries the burden of proof on its Complaint.

6. AT & T carries the burden of proof on its Counterclaim.

7. The Shareholder Plaintiffs carry the burden of proof on their Complaint.

8. Under Maryland law, corporate directors have an obligation to act in the manner which they reasonably believe is in the best interests of the corporation.

9. Under the business judgment rule, which is applicable in Maryland, a corporation's board of directors are presumed to have acted reasonably and in good faith.

10. To be protected by the business judgment rule, it is not enough that a director be merely "pure of heart;" a director has a fiduciary duty to avail himself of reasonably available information in preparation for making decisions on behalf of the corporation and its shareholders.

11. Similarly, the decision of a board of directors is not entitled to protection under the business judgment rule if information material to that decision was withheld by company management.

12. Based on the foregoing analysis, the Court concludes that the decision of the NCR Board to adopt the ESOP was not made in bad faith.

13. The decision to adopt the ESOP was, however, made on the basis of grossly inadequate information. Therefore, NCR has not met its burden of proving that the ESOP is valid and enforceable under the business judgment rule.

14. Under the primary purpose test, an action taken by a board of directors in the face of a proxy fight which has the effect of perpetuating management control is to be scrutinized to determine whether that action serves any legitimate corporate purpose. If the action in question does serve a legitimate purpose, the court must balance the evidence and determine whether the primary purpose was legitimate or whether the transaction was entered into with the primary goal of perpetuating management control.

15. The adoption of the NCR ESOP in the face of AT & T's tender offer has the effect of perpetuating management control.

16. The NCR ESOP does serve a legitimate corporate purpose. However, that legitimate purpose is secondary to the primary purpose of entrenching NCR's management.

17. AT & T and the Shareholder Plaintiffs have met their burden of demonstrating, by a preponderance of the evidence, that the NCR ESOP is invalid and unenforceable. Accordingly, the Court hereby declares NCR Corporation's Employee Stock Ownership Plan to be invalid and unenforceable.

18. To be entitled to a permanent injunction, a party, in addition to prevailing on the merits, must prove that it will suffer a continuing irreparable injury if an injunction does not issue, and that he or she lacks an adequate remedy at law.

19. Both AT & T and the Shareholder Plaintiffs have proven, by a preponderance of the evidence, that they will suffer continuing irreparable harm if the ESOP is not invalidated and the preferred shares created thereunder are not enjoined from voting at the special meeting. Neither AT & T nor the Shareholder Plaintiffs has an adequate remedy at law.

20. Both AT & T and the Shareholder Plaintiffs are entitled to a permanent injunction invalidating NCR Corporation's Employee Stock Ownership Plan and enjoining the preferred shares issued thereunder from voting at the March 28, 1991, special meeting.

Wherefore, based upon all of the foregoing, the Court hereby declares that NCR Corporation's Employee Stock Ownership Plan is invalid and unenforceable, and hereby permanently enjoins any and all pre-

ferred shares created thereunder from voting at the March 28, 1991, special meeting. Judgment will be entered in favor of AT & T and against NCR on NCR's Complaint and in favor of AT & T and against NCR and NCR's Board of Directors on AT & T's Counterclaim in Case No. C–3–91–78. Judgment will be entered in favor of the Shareholder Plaintiffs and against NCR and NCR's Board of Directors on Count VIII of Case No. C–3–91–12. With respect to the judgment to be entered in Case No. C–3–91–12, the Court expressly determines that there is no just cause for delay; therefore, the Court directs that final judgment be entered, pursuant to Fed.R.Civ.P. 54(b), as to the claims relating to the validity of the ESOP (Count VIII).

*NCR Corporation v. American Telephone and Telegraph Company,* Case No. C–3–91–78, is hereby terminated upon the docket records of the Southern District of Ohio, Western Division, at Dayton.